[Crim. No. 1202. Second Appellate District, Division One.—July 10, 1925.]

THE PEOPLE, Respondent, v. S. A. PACE, Appellant.

[1] CORPORATE SECURITIES ACT—SALE OF OWN SECURITIES—BROKER'S PERMIT—CONSTITUTIONAL LAW.—Section 2 of the Corporate Securities Act, as amended in 1923, so far as it attempts to require a natural person owning securities, of which he is not the issuer or underwriter, to secure a broker's permit as provided in said act before he may lawfully sell such securities, where the sale is made "in the course of repeated and successive transactions of like or similar character by him," is unconstitutional and invalid as being in direct contravention of the inalienable right of every citizen to enjoy, acquire, possess and protect his property, as guaranteed by the federal and state constitutions; as denying the equal protection of the law; and as being indefinite in that it is not known what is meant by the term "in the course of repeated and successive transactions" or by the term "of like or similar character."

[2] ID. — INDIVIDUAL RIGHTS — GENERAL WELFARE — STATUTORY CONSTRUCTION.—While it is true that the increasing conflict between the rights of the individual and the general welfare of society presents ofttimes difficult and perplexing problems, nevertheless courts should not and will not permit the violation of those most fundamental rights that underlie our very existence as a nation.

[3] ID.—STATUTES—CERTAINTY OF LANGUAGE USED.—In order that an act of the legislature attempting to prescribe what acts shall be deemed a public offense may meet the test of validity it is neces-

---

1. Validity of Blue Sky Laws, note, 40 A. L. R. 1014. See, also, 6 Cal. Jur. 780.

3. See 7 Cal. Jur. 843; 8 R. C. L. 58.

sary that the language used shall be of such clarity of expression that one of average intelligence would be able to understand what is prohibited and what he may do without violating the law.

(1) 12 **C. J.**, p. 787, n. 79, p. 928, n. 13, p. 932, n. 32, 33, p. 945, n. 24, 24 New, p. 1280, n. 78.    (2) 12 **C. J.**, p. 920, n. 56, p. 1144, n. 4, p. 1145, n. 5, p. 1160, n. 43.    (3) 16 **C. J.**, p. 68, n. 9; 36 **Cyc.**, p. 969, n. 90.

APPEAL from a judgment of the Superior Court of Los Angeles County. Russ Avery, Judge. Reversed.

The facts are stated in the opinion of the court.

C. B. Conlin and E. R. Simon for Appellant.

U. S. Webb, Attorney-General, H. H. Linney and John W. Maltman, Deputies Attorney-General, for Respondent.

Puter & Quinn, Randall & Bartlett and Ovila N. Normandin, *Amici Curiae.*

HAHN, J., *pro tem.*—The defendant in this case was accused by the district attorney of the crime of violating the Corporate Securities Act, committed as follows:

"That the said S. A. Pace on or about the 28th day of November, 1923, at, and in the County of Los Angeles, State of California, did wilfully, unlawfully and feloniously engage, either wholly or in part, in the business of selling, offering for sale, negotiating for the sale of, and otherwise dealing in securities and securities issued by others, and of underwriting issue of securities and of purchasing such securities with the purpose of reselling them and offering them for sale to the public, to wit, as follows: Shares of stock in the United Candy Shops Corporation, a corporation. And the said S. A. Pace was not then and there an agent of the said United Candy Shops Corporation, a corporation, and did not then and there have any permit from the Commissioner of Corporations of the State of California as a broker, or otherwise so to do."

The case was submitted to the jury upon a stipulation of facts based upon the testimony given and the evidence in-

troduced at the preliminary hearing. From this stipulation, the following material facts may be gleaned:

That the United Candy Shops was a corporation formed under the laws of the state of California; that some time prior to March 8, 1923 (the exact dates not appearing in the stipulation), the commissioner of corporations of California issued an original and several supplemental permits granting to the United Candy Shops permission to sell certain portions of its capital stock; that these permits were all revoked on March 8, 1923; that the defendant, S. A. Pace, was granted a broker's permit on February 21, 1922, which entitled him to sell securities; that this permit was revoked on December 8, 1922; that the defendant was a director of the United Candy Shops and, some time in the month of February, 1923, was elected president of the corporation; that during the period that the permits to sell stock and the defendant's permit as a broker were in full force and effect, a number of subscriptions to treasury stock of the United Candy Shops were obtained and some of this stock was sold to purchasers on time payments. It would appear that the defendant made some of these sales on time contracts. The method pursued in connection with the partial-payment contracts was for the purchaser to make the first payment in cash and give a promissory note for the balance of the purchase price. Thereupon the stock was issued in the name of the purchaser and indorsed in blank by the purchaser and then returned to the corporation to be held as collateral security for the payment of the note. In a number of these contract sales the purchasers defaulted in their payments and, the company being in need of cash, the defendant purchased from the company a number of these notes that were in default, paying to the company in cash the balance remaining unpaid, and thereupon the notes were assigned by the corporation to the defendant and the collateral also delivered with the notes. Thereafter the defendant, by reason of the terms and conditions contained in the notes, dealt with this collateral stock as though it was his own stock and disposed of at least a portion of this stock so acquired in sixteen different sales covering a period of about five months. It does not appear whether he sold all or only a part of the stock so acquired. All of these sales were made after the permits issued to the corporation

to sell stock had been revoked, and also after the permit issued to the defendant to act as broker had been revoked. It appears further from the stipulation that in practically all of these sixteen sales the defendant informed the purchasers that the stock that they were buying was not treasury stock, but was being transferred to them from some individual, whose name, however, was not given by the defendant to the purchaser. It further appears that the corporation received no part of the money paid by the purchasers, but all of the money paid for this stock was retained by the defendant as his own funds.

It was not contended at the trial, nor is it urged here on appeal, that the defendant was not the *bona fide* owner of the stock sold; nor does the attorney-general urge that the defendant, either in acquiring any of this stock or in making sales of any of it, was acting for the corporation. No suggestion is made that, in the defendant acquiring and selling this stock, a subterfuge was resorted to in order to avoid the necessity of the corporation procuring a permit.

[1] The appeal before us squarely presents the question as to whether or not an individual, who is a *bona fide* owner of securities, may lawfully sell such securities, or any part of them, in repeated and successive transactions of like or similar character, without first complying with certain requirements of the Corporate Securities Act required of brokers, and without securing a broker's license.

Paragraph 9 of section 2 of the Corporate Securities Act, as amended in 1923 [Stats. 1923, p. 89], reads as follows:

"The word 'broker,' as used in this act, includes every person or company, other than an agent, who shall, in this state, engage either wholly or in part in the business of selling, offering for sale, negotiating for the sale of, or otherwise dealing in any 'security' or 'securities' issued by others, or of underwriting any issue of 'securities,' or of purchasing such 'securities' with the purpose of re-selling them, or of offering them for sale to the public. The word 'securities,' as used in this paragraph, includes the following 'securities' issued by 'individuals':

"Any instrument offered to the public by an 'individual' evidencing or representing any right to participate or share in oil, gas or other hydrocarbon substances or other minerals

of any sort, as yet undeveloped, or in the proceeds of sale thereof;

"All bonds, debentures and evidence of indebtedness offered to the public by an 'individual.'

"The following are excepted from the provisos of this paragraph:

"(a) Any owner of any security who is not the issuer or an underwriter thereof, who sells or exchanges the same for his own account; *provided, that such sale or exchange is not made in the course of repeated and successive transactions of like or similar character by him; . . . "*

Appellant contends that the last clause in subdivision (a), which reads: "provided, that such sale or exchange is not made in the course of repeated and successive transactions of like or similar character by him," is unconstitutional and void for the following reasons:

First: That it violates the guaranties contained in that portion of the fourteenth amendment to the federal constitution which reads as follows: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Second: That it is in conflict with the declaration of rights set forth in section 1 of article I of the constitution of the state of California, which provides that: "All men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property; and pursuing and obtaining safety and happiness."

Third: That it is also in conflict with that guarantee set forth in the declaration of rights and contained in section 13 of article I of the constitution of the state of California, which provides that no person shall "be deprived of life, liberty or property without due process of law."

Appellant also urges that the clause in question is so indefinite, uncertain and vague as to be unconstitutional and void.

Supporting counsel for the defendant in urging these contentions, several counsel interested in the question involved,

upon permission being granted by this court, have filed briefs as *amici curiae.*

It will readily appear from a reading of the portions of the Corporate Securities Act above quoted that any individual who is the owner of securities and not the issuer or underwriter of them, may dispose of such securities by selling them for his own account, provided that he accomplishes the disposition of them in one transaction or one sale. But if he should find it inconvenient or impossible to dispose of his securities in a satisfactory manner to one purchaser, but should find two or more purchasers who would take them in separate lots, each lot to a separate purchaser and in a separate transaction, he must first secure a broker's license before he may lawfully make more than one sale.

The act further provides that before any individual may secure a broker's license he must make application to the commissioner of corporations, setting forth in such petition certain information concerning himself and the securities which he desires to sell. He must also file with his application a bond in the sum of $5,000 conditioned upon his compliance with the laws of the state of California in making any sales: However, before the broker's permit may be issued to him, the commissioner must satisfy himself that the petitioner is a man of "good business reputation." If the commissioner should not be satisfied that the applicant possesses a "good business reputation," or if, perchance, he concludes that the business reputation of the applicant is bad, he must refuse to issue a broker's license to the applicant; and, further, if at any time after the issuance of the permit to the broker, the commissioner shall ascertain or conclude that the holder of the permit is a man of "bad business repute," or has violated any provision of the Corporate Securities Act, or has engaged in or is about to engage in any fraudulent transaction, the commissioner of corporations may revoke the broker's permit.

If the provision of the Corporate Securities Act under consideration is a proper exercise by the legislature of its constitutional power, then this situation may and would inevitably arise: A and B are each the owner of $25,000 in par value of bonds, stocks or other securities; each is desirous of disposing of these securities. A may be fortunate in having a banking or other connection to which he is able to

dispose of all of his securities in one sale or transaction. In such event he would not be required to file an application for a broker's permit, or go to the trouble and expense of furnishing a $5,000 bond. Moreover, he might be a man of a most unsavory business reputation and stand charged with, or even convicted of, all the crimes. enumerated in the decalogue. Without any hindrance or control, the act permits him to exercise his inalienable right to thus dispose of his own property.

B, for reasons that might in no way reflect upon his business integrity, honesty, or good character may not have such a business connection or acquaintance that would enable him to dispose of all of his securities in one sale, but he might be able to make satisfactory disposition of them to two or more purchasers in as many different transactions. After he has made the first sale, he cannot make a second or succeeding sale until he has first filed his application for a broker's permit; posted a $5,000 bond; paid the commissioner's fee; and awaited a sufficient time to enable the commissioner to ascertain whether his business reputation is good or bad. If the commissioner is satisfied with his business reputation, after waiting an indefinite period—as there is no time limit provided in the act within which the commissioner shall issue the permit—a permit is issued and B is then enabled legally to dispose of the balance of his securities. If his securities were of a character that fluctuated on the market, this delay may mean a considerable loss to him, which A is not compelled to suffer. If, on the other hand, the commissioner should find the business reputation of B unsatisfactory, although nowhere near as unsavory as the reputation of A, the broker's permit is denied and B is thus prevented from disposing of the balance of his securities.

Manifestly, any act of the legislature which creates such a situation, is void as being in direct contravention of the inalienable right of every citizen to enjoy, acquire, possess and protect his property, as guaranteed by the federal constitution and also the constitution of the state of California.

The attorney-general, in his usual able manner, dwells at length in his brief upon the general proposition of the constitutionality of the so-called "Blue Sky" legislation.

In view of the fact that the constitutionality of this type
of legislation has been upheld by the supreme court of the
United States in *Hall* v. *Geiger-Jones Co.*, 242 U. S. 539
[Ann. Cas. 1917C, 643, L. R. A. 1917F, 514, 61 L. Ed., 480,
37 Sup. Ct. Rep. 217, see, also, Rose's U. S. Notes Supp.],
and by our own supreme court in *In re Girard,* 186 Cal. 718
[200 Pac. 593], we do not feel it is necessary to discuss this
general question, or even to consider in detail the opinions
of the various courts in the cases cited by the attorney-gen-
eral.   However, it may be observed in passing that in only
two of the many cases cited on the general subject does it
appear that the court had under consideration the question
of the right of an individual to sell or dispose of his own
securities under circumstances such as are involved here,
and certainly we have been unable to find any decision
wherein a definite declaration is made by the court upon
the question here involved.

In the case of *Hall* v. *Geiger-Jones Co., supra,* the court
had under consideration an act of the legislature of Ohio
dealing with investment companies.   This act, after defining
the term ''dealer,'' uses the following language in making
an exception to the class included in the term ''dealer'':
''An owner, not the issuer of the security, who disposes of
his own property, for his own account; when such disposal is
not made in the course of repeated and successive trans-
actions of a similar character by such owner; or a natural
person, other than the underwriter of the security, who
is a *bona fide* owner of the security and disposes of his own
property for his own account.''

The first part of the above-quoted portion of the Ohio
statute is almost identical in wording with the clause here
under attack, but the last portion of the quoted clause
clearly eliminates any question as to the right of a natural
person, not an underwriter, to sell his own securities.   Ap-
parently the Ohio legislature, feeling that the language in
the first part of the exception might be ambiguous or cause
confusion, added the closing paragraph in order to make it
clear that the legislature was not attempting to prevent a
natural person from selling his own securities whether in one
sale or repeated sales.   In view of the wording of the Ohio
statute, it is very clear that nothing in the opinion in the
case of *Hall* v. *Geiger-Jones Co., supra,* can be regarded as

supporting the constitutionality of the clause here under attack. It is quite clear that it is the *business of selling securities* that is the subject of regulation. In *Hall* v. *Geiger-Jones Co., supra,* the court says: "It will be observed, therefore, that the law is a regulation of business, constrains conduct only to that end, the purpose being to protect the public against the imposition of unsubstantial schemes and the securities based upon them."

In *Ex parte Girard, supra,* the sole question involved was whether the method of selling units by trustees who held the title to the property under a so-called "Massachusetts Trust" came within the purview of the California Corporate Securities Act. The opinion written by Mr. Justice Shaw sustaining the contention of the attorney-general that the acts complained of by the defendants in selling and transferring units came within the law requiring a permit from the corporation commissioner, clearly indicates that the question of the right of a natural person to dispose of his own securities by sale or exchange, even though in repeated and successive transactions, was not under consideration by the court.

Another type of cases cited in the brief of the attorney-general involves statutes which simply provide for the filing of certain information with some state official before stock securities or patent rights may be offered for sale, or sold. In statutes of this type, no authority is vested in the state official with whom the information is required to be filed to exercise any discretionary power in granting or refusing a permit. This type of legislation has been generally sustained as constitutional on the general theory that the legislature has power to direct the method to be followed in disposing of certain types of property. This power has been recognized in statutes requiring the recording and filing of certain documents, claims, notices, and other proceedings, in order that rights may be established or effectively maintained. Statutes of this type were under consideration by the court in the cases of *Goodyear* v. *Meux,* 143 Tenn. 287 [228 S. W. 57]; *Mason* v. *McLeod,* 57 Kan. 105 [57 Am. St. Rep. 327, 41 L. R. A. 548, 45 Pac. 76], and *Allen* v. *Riley,* 203 U. S. 347 [8 Ann. Cas. 137, 51 L. Ed. 216, 27 Sup. Ct. Rep. 95, see, also, Rose's U. S. Notes].

In the case of *Bracey* v. *Darst*, 218 Fed. 482, the court had under consideration the constitutionality of certain provisions of the so-called "Blue Sky Law," of West Virginia. The opinion in this case was written prior to the decision in the case of *Hall* v. *Geiger-Jones Co.* and deals at some length with the general question of the constitutionality of this type of legislation, and reviews all of the decisions rendered at that time on the subject. It is apparent in reading the opinion that the principal reason for holding the act unconstitutional was the fact that the law undertook to require any individual, before disposing of his own personal securities and for his own account, to secure a statement or permit from the state auditor. The opinion dwells at length upon a similar act of the legislature of Florida which had been sustained and which included this proviso: "Provided that nothing in this act shall extend to any seller of stock, bond or other security, who has purchased the same in good faith for value, and who is the *bona fide* owner of such stock, bond, or other security at time of such sale." The following excerpt from the opinion of the court in *Bracey* v. *Darst, supra,* would indicate that the attorney-general in that case conceded that the act could not legally prohibit an individual from selling his own stock: "It is now substantially admitted that if its intent is to prevent a 'citizen' from selling his own notes or other obligations, or bonds, securities, etc., which he may have acquired in the course of business, without a certificate from the auditor of solvency and 'sound business capacity,' it is clearly subversive of the inalienable right he has to acquire and sell property, and its validity cannot be asserted." It is interesting further to note that Circuit Judge Woods, who sat in the case and wrote a dissenting opinion, makes the following interpretation of the language of the act as necessary to its constitutionality: "In the first place, it seems quite clear that the statute is limited in its application to corporations, and to individuals acting in concert by organization—that is, by making a whole of interdependent parts—and was not intended to apply to a single individual conducting his own business."

In the case of *William R. Compton Co.* v. *Allen*, 216 Fed. 537, the United States circuit court had under consideration the "Blue Sky Law" of Iowa, by the terms of which any

person, whether natural or corporate, who was not a resident of Iowa, was required to secure.from the Secretary of State a statement or permit before he could sell his own stock or securities within the state of Iowa. The constitutionality of this act was attacked by a natural citizen of the state of Illinois as well as corporate citizens of other states. A restraining order withholding enforcement of the act was issued by the presiding judge and subsequently sustained by the entire court on the ground that it undertook to prohibit a person being a citizen of another state from selling his own stock or securities in the state of Iowa.

In answering appellant's contentions, the attorney-general does not deny that the section of the act under attack will, if upheld, interfere with the freedom heretofore exercised by a natural citizen in disposing of his own securities, nor is any answer offered to the assertion that under this section of the act, an individual may be prevented altogether from selling his securities. Rather it is urged that this and any other results flowing from the enforcement of the section under consideration and which may hamper the individual in selling his securities, are incidental to, but necessary in accomplishing an effective control of investment companies; and inasmuch as the purpose of the act, to wit, the control and regulation of the business of selling securities, has been held to be a proper exercise of the police power, such burdens and restrictions upon the individual's right to sell his own securities as the legislature may deem essential to accomplish the purpose of the act should be held likewise to be within the police power.

We are thus presented with the oft-occurring problem of determining how far legislative enactments shall be permitted to encroach upon the rights of the individual to acquire, possess and dispose of his property. When the questions of health, morals or safety are involved, the path for judicial action is clearly defined by a long course of decisions, but when the test is that of "general welfare" courts are confronted with many difficult and conflicting considerations, as well as a multitude of diverse judicial decisions. It must be conceded that the changes in our social and economic relations require from time to time changes in the rules which govern the relation of the individual towards society, and that these changes must needs be re-

flected in legislative enactment and also in judicial interpretation. But there are well-defined limits as to the extent to which such legislation may go in depriving a natural person of his right to possess property. Nor will the argument of the greatest good to the greatest number, or even the unquestioned beneficial results that might flow from such legislation, avail as against the constitutional guaranty.

The Corporate Securities Act belongs to that type of legislation sometimes referred to as the "paternal activity" of government. It is an attempt to throw about the individual who is about to invest his money in certain kinds of property a protecting arm of governmental authority. In other words, by regulating and controlling those engaged in the business of selling certain types of personal property, and if need be prohibiting certain undesirable persons or concerns from engaging in that type of business, the law protects those from loss who, either through carelessness or ignorance, might otherwise become the victims of fraudulent design.

Legislation of this character from the outset has been vigorously assailed and until the decision in the case of *Hall* v. *Geiger-Jones Co.*, 242 U. S. 539 [Ann. Cas. 1917C, 643, L. R. A. 1917F, 514, 61 L. Ed. 480, 37 Sup. Ct. Rep. 217, see, also, Rose's U. S. Notes Supp.], judicial opinion was divided on the question of the constitutionality of such legislation. But nowhere in the authorities sustaining the regulation of the business of brokers do we find authority to sustain the contention made here, that the police power under the guise of general welfare may be invoked to interfere with the sale by an individual of his own property when the acquiring and possession of such property is not contrary to law.

The attorney-general in his brief makes this significant statement: "It is also true that laws may not be enacted which arbitrarily and without any reason therefor deprive a citizen of his liberty or property, but it must be remembered that it does not necessarily follow that a law which regulates the mode of disposing of property takes away the right of disposition. On the contrary, it is well established that laws which reasonably regulate the mode of disposing of property do not take away the owner's right of disposition." The section of the act in question, if sustained, in connection with other provisions of the act "does more than

regulate'' the mode of ''disposing of property.'' As we have heretofore pointed out, the corporation commissioner would have the power and it would be his duty to refuse a person a broker's permit if he had a ''bad business reputation,'' and by such refusal the person would be prevented from disposing of his own individual property which he had lawfully acquired and lawfully possessed, if such disposition were made in more than one transaction. It does not answer the charge that the act in question is unconstitutional to say that a person clothed with such power may not see fit to use the power. The rule in determining whether the act is in conflict with constitutional guaranties is whether or not the act is broad enough to authorize such unconstitutional act.

The attorney-general urges further that if the corporation commissioner is not given the power to control and regulate the individual in the sale of his own securities, the whole purpose of the Blue Sky legislation will be defeated, in that concerns desirous of disposing of securities tainted with fraud would circumvent the law by fraudulently placing such securities in the hands of individuals who would thus claim such securities as their individual property and dispose of them for the benefit of their principal. In answer to this proposal, we would suggest that if the purpose of the section is to prevent fraudulent conduct in the sale of securities, it would not be a difficult matter to draft a provision of the law that would meet such a need. We know of no authority that would sustain the contention that in order to make more effective a worthy regulation, that an invasion of individual rights as guaranteed by the constitution would be justified. If the regulation of the business of brokers engaged in the sale of securities cannot be enforced in a manner satisfactory to the corporation commissioner without giving him the power to reach out and invade individual rights, then the legislation in question must necessarily fail in part at least of the purpose which is sought in this enactment.

In *Ex parte Quarg*, 149 Cal. 79 [117 Am. St. Rep. 115, 9 Ann. Cas. 747, 5 L. R. A. (N. S.) 183, 84 Pac. 766], Mr. Justice Shaw, in considering the constitutionality of legislative enactment prohibiting the sale or offering for sale of theater tickets at a price in excess of that originally charged

by the theater, makes this comment: "The constitutional guaranty securing to every person the right of 'acquiring, possessing, and protecting property,' refers to the right to acquire and possess the absolute and unqualified title to every species of property recognized by law, with all the rights incidental thereto, and, in connection with the right of personal liberty, it includes the right to dispose of such property in such innocent manner as he pleases, and to sell it for such price as he can obtain in fair barter."

The principle enunciated by Mr. Justice Shaw has been declared in frequent decisions and needs no additional citations. However, it is urged that the opinion in *Ex parte Quarg* is not in point, because the sale of theater tickets does not involve the "general welfare." It must be conceded that the ownership of a theater ticket finds its basis in the same personal right that the ownership of a bond or any other security finds its law; and if the owner of a theater ticket may sell it unhampered by legislative regulation or prohibition, we are unable to ascertain upon what theory the owner of a bond or other security may not exercise the same untrammeled right.

The attorney-general concedes that it would invade the constitutional rights of a citizen if he were prohibited from selling his securities, which he would have the legal right to buy and possess, but contends that the law under consideration is simply a regulation, and in support of this argument cites certain cases which have sustained laws which were merely regulatory in their requirements. If the act under consideration were confined simply to a requirement that all owners of certain types of securities, before selling them, should file with some official certain information, and thereupon they would have the right to dispose of their property without any other burden or interference, the position of the attorney-general might be maintained. But this is not the situation that confronts us. The act in part provides for regulation, but also provides a power to refuse a permit, which would make absolute prohibition in the sale of one's securities. The only purpose of the act in requiring the filing of certain information in the form of a petition by a person desiring to sell securities is to lay the foundation for action by the corporation commissioner that may or may

not, according to his finding, result in an absolute prohibition of the sale of his securities.

In these days when the urge is strong upon legislative bodies to extend the paternal arm of government into the realm of economic activities, it is particularly important that courts in the exercise of the particular functions imposed upon them by the constitution, shall scrutinize with care legislation which tends to encroach upon the constitutional guaranties, to the end that the right of the individual to liberty and possession of property shall become, not a mere theory, but shall be maintained as a practical reality. **[2]** And while it is true that the increasing conflict between the rights of the individual and the general welfare of society presents ofttimes difficult and perplexing problems, nevertheless courts should not and will not permit the violation of those most fundamental rights that underlie our very existence as a nation. (*Dobbins* v. *Los Angeles,* 195 U. S. 223 [49 L. Ed. 169, 25 Sup. Ct. Rep. 18, see, also, Rose's U. S. Notes]; *Pacific Palisades Assn.* v. *City of Huntington Beach et al.,* 196 Cal. 211 [40 A. L. R. 782, 237 Pac. 538].)

Appellant further urges that the defendant in this case is denied the equal protection of the law by the section of the act under consideration, in this: That any owner of securities who is not the issuer or underwriter thereof, and who sells for his own account, may do so without hindrance or complying with any provision of the act, provided that he accomplishes the disposal of the securities in one sale or exchange; but when, for any reason, he desires to make a second or a third or a fourth sale he is by the act deprived of the rights which are accorded to one who desires to make only one sale. As we have pointed out in the outset of this opinion, it is readily apparent that if the act in question is sustained, a great many individuals who are the owners of securities which they themselves did not issue or underwrite, would be required to secure a broker's license, which involves the filing of a petition, the awaiting of the decision of the corporation commissioner as to whether or not a broker's license will be issued, the securing and filing of a bond, and perchance eventually the refusal of a broker's license; while other individuals who find it convenient or possible to accomplish the same purpose in making one sale

would be relieved from such burdens. It is difficult to believe that the legislature intended to impose burdens on certain individuals in this manner that would not apply to all persons of the same class, for certainly there is no basis in law for such a distinction. We might suggest in passing that undoubtedly thousands of our citizens are selling from time to time securities which they have acquired, and disposing of these securities in repeated and successive sales without having secured any broker's license and without even the thought that such legitimate and innocent conduct, without securing a broker's license and furnishing a bond, is in violation of the Corporate Securities Act.

Any legislative enactment that is reasonably subject to the interpretation we have just pointed out manifestly is in conflict with the fourteenth amendment to the constitution of the United States. In 12 Corpus Juris, page 1144, this proposition is thus stated: "The amendment (the fourteenth) was intended to secure equality of right, and it renders unconstitutional all laws which may properly be construed as applying to persons or property arbitrarily and with discrimination, unequally or unjustly."

The appellant also urges that the language of the section is so indefinite, uncertain and vague as to make it unconstitutional and void; and in this behalf it is pointed out that the term "in the course of repeated and successive transactions" is indefinite, as is also the term "of like or similar character." We feel that the section is subject to the criticism urged. It probably would be conceded that two or more transactions would constitute "repeated transactions," and necessarily, if one follows the other, they would be "successive transactions." But one contemplating the sale of his securities would be at a loss to know, so far as the section in question indicates, whether he would be liable if he should make one sale every twelve months, or every thirty-six months, or even every ten years. [3] In order that an act of the legislature attempting to prescribe what acts shall be deemed a public offense may meet the test of validity it is necessary that the language used shall be of such clarity of expression that one of average intelligence would be able to understand what is prohibited and what he may do without violating the law. Mr. Justice Melvin

in his opinion in the case of *In re Lockett*, 179 Cal. 581 [178 Pac. 134], discussing this question of clarity, says: "So important is the liberty of the individual that it may not be taken away even from the most debased wretch in the land, except upon conviction of a crime which has been so clearly defined that all might know in what act or omission the violation of the law should consist." The same question was before the supreme court of this state in the case of *In re Peppers*, 189 Cal. 682 [209 Pac. 896], where the court held unconstitutional section 10 of the California Fruit and Vegetable Standardization Act of 1921 on the ground of indefiniteness.

Chief Justice Waite of the United States supreme court in the case of *United States* v. *Reese*, 92 U. S. 214 [23 L. Ed. 563, see, also, Rose's U. S. Notes], in discussing a similar question, observes: "Laws which prohibit the doing of things and provide a punishment for their violation, should have no double meaning. A citizen should not unnecessarily be placed where, by an honest error in the construction of a penal statute, he may be subjected to a prosecution for a false oath; and an inspector of elections should not be put in jeopardy because he, with equal honesty, entertains an opposite opinion. . . . Penal statutes ought not to be expressed in language so uncertain. If the legislature undertakes to define by statute a new offense and provide for its punishment, it should express its will in language that need not deceive the common mind. Every man should be able to know with certainty when he is committing a crime."

We do not deem it necessary to burden this opinion with extended citations which are available to support the propositions of law here urged by the appellant, nor the many authorities which may be cited in support of the application of the legal principles to the facts here involved.

We are of the opinion that the section of the Corporate Securities Act under consideration, so far as it attempts to require a natural person to secure a broker's permit as provided in said act before he may lawfully sell his own securities, where he is not the issuer or underwriter of the same, is unconstitutional and invalid for the reasons herein set forth.

It therefore follows that the judgment of the lower court must be and it is reversed.

Conrey, P. J., and Curtis, J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 5, 1925.

Lawlor, J., Acting C. J., dissented.