[Crim. No. 2567. Second Appellate District, Division One.—July 3, 1935.]

THE PEOPLE, Respondent, v. W. A. VICKERS et al., Defendants; JOHN M. JACKSON, Appellant.

Moses C. Davis and Gerard Remington for Appellant.

U. S. Webb, Attorney-General, and William F. Cleary, Deputy Attorney-General, for Respondent.

ROTH, J., *pro tem.*—In one action, defendants Vickers and Jackson were accused of several offenses, including grand theft as charged in count V of the information. In another action, they were accused of several offenses, including violation of the Corporate Securities Act as charged in count V of the information. Each defendant was convicted on each one of said counts V. Both defendants appealed, but the appeals of defendant Vickers have been dismissed. Therefore, we are to consider only the appeals of defendant Jackson (hereinafter called the appellant or Jackson) from the judgments against him, and from the order denying his motion for a new trial.

At the trial these two cases were consolidated and tried together. The appeals are here presented on one record and on one set of briefs.

The said grand theft count charges that the crime was committed as follows: That the defendant, on or about the fourth day of May, 1932, did wilfully, etc., take away $6,700 in money, etc., "of the personal property of one Elizabeth A. Frost".

The other count V charges that the defendants committed the crime therein named, as follows: That the defendants, on or about the fourth day of May, 1932, did wilfully, etc., "sell, and offer for sale, securities of a certain corporation

known as the Ultra-Violet Corporation, Ltd., to one Elizabeth A. Frost, without having first applied for and/or received a permit from the Commissioner of Corporations of the State of California so to do''.

The facts as testified to by prosecution witnesses, upon which the convictions were had and which form the basis for the original ten several charges against Vickers and appellant (so far as they can be clearly crystallized from a maze of evidence confusing in the extreme, but because of the consolidation of the cases, much of it apparently relevant against one or the other of defendants, and still further complicated by the introduction and receipt of evidence on a theory of conspiracy, which evidence proved to be rank hearsay so far as appellant was concerned), appear to be as follows:

Elizabeth A. Frost, a maiden lady, seventy years old, of defective hearing and impaired eyesight, was possessed of substantial means consisting of real estate, stock and bonds, and some cash. She engaged one Whitehorne to sell one of her lots in Mesmer City. Appellant Jackson, it appears, met Miss Frost the early part of January, 1932, while looking at one of the lots she had given Whitehorne to sell, and although it is not clear, apparently through Whitehorne. Appellant seemed pleased with the lot and telephoned Miss Frost several times about it. But in the meantime Whitehorne brought Vickers to meet Miss Frost on or about January 28, 1932, according to her testimony, who agreed to buy the lot, which he apparently did, for nothing down and the promise of deferred payments which were never made.

What specific negotiations, contacts or conversations took place between Miss Frost and Vickers from the time of the first meeting is not clear, but it appears from an abundance of evidence that Miss Frost almost immediately invested Vickers, whom she had never met before she was introduced to him by Whitehorne, with a plentitude of trust and confidence, and told him all her troubles of a financial nature. She confided to Vickers how her estate—telling him in detail the nature thereof—had dwindled, and told him how worried she was about having enough to live on through her old age, and also about some cousin or cousins for whom she felt a financial responsibility.

Vickers had formerly been an insurance broker, whose license had been revoked. He persuaded Miss Frost that she

should sell her securities and thereby amass enough cash to purchase an annuity paying her $2,000 per year; whereupon Miss Frost took her securities, and in company with Vickers and Whitehorne, delivered them to brokers for sale. Through the sale of these securities made at periodic intervals, and perhaps from other sources, Miss Frost collected a total in excess of $17,000, and periodically, as money came into her hands, she turned the same over to Vickers, who did actually in each instance deliver the same to the insurance company to apply on the annuity in question, until the sum required for the annuity was paid in full, and the transaction was completed, exactly when does not appear.

Returning to appellant, whether Miss Frost had just one meeting (already mentioned) with him alone, or a subsequent one in the latter part of January or the first part of February, 1932, does not appear. She recalled, however, after persistent and suggestive questioning, that when she met Jackson he made "a pleasant call" and conversed of "ultra violet"; "Doctor Strong a very eminent surgeon and scientist"; "that it certainly was a wonderful proposition, and it certainly was going to be a very paying proposition". (What was certainly wonderful or paying cannot be gleaned from her report of her conversation with Jackson.)

Questioned specifically as to Jackson's connection with the corporation, which she evidently meant when she used the term "ultra violet" (the nature of which will be discussed in more detail later), the record shows the following:

"Q. Did Mr. Jackson tell you what connection, if any, he had personally with the corporation? A. No, I would not say so. Q. Did he talk with you with reference to any amount you should invest? A. No. Q. Was the method of your investment discussed, as to whether you were to buy stock or an interest? A. No, when I did— Q. No, in this first conversation, was the method of your investment discussed? A. No, I think it was just a pleasant conversation with regard to what this thing was. Q. When was the next conversation you had with anyone of these three gentlemen with reference to the Ultra-Violet Ray investment? A. I took it up with Mr. Vickers, and I asked him to look into it for me."

To clarify the picture it should now be stated that one Dr. Frederick F. Strong was the inventor of and had obtained a

patent or patents on certain "cold mercury quartz ultraviolet lamps" (which will hereafter be referred to as lamp or lamps), which patents he assigned to Radiant Holding Corporation, a Nevada corporation, organized the latter part of 1931 (hereinafter referred to as Radiant). At the same time Radiant was organized, another corporation to act as licensee was also organized in the state of Nevada called Ultra-Violet Corporation, Ltd. (hereinafter called Ltd.). The scheme of corporate operation seems to have been that Radiant was to own the patents and Ltd. as a subsidiary and licensee under the patents was to manufacture and dispose of the lamps. The patents in question were *bona fide* and were actually assigned to Radiant. The persons participating (aside from dummy incorporators) in the organization of these corporate entities were Strong, a quartz technician called Carl Grimm, Bowers, an attorney, one Bristow, joint inventor with Strong, who was in charge of the manufacture of the lamps, and appellant Jackson. According to Strong (a prosecution witness), appellant was an expert in therapeutic application. This is nowhere denied, and seems to be the fact. Bristow, Jackson and Strong had previously been associated in two other corporations, which apparently had been organized for the same purposes as the two Nevada entities mentioned, but because of a default in complying with legal obligations in regard to the patents, or for some other legal reason, the patents themselves and the manufacturing rights were taken from the two original corporations and vested in the Nevada corporations organized, as has been stated, in the latter part of 1931.

Inasmuch as the charges in these consolidated actions arise out of alleged dealings between Miss Frost and appellant, it is unnecessary to delve into the testimony showing the activities of the prior corporations, the newly organized Nevada corporations or the fact that money was obtained from others, or the other suggested activities of Strong, Bristow or Jackson. Suffice it to say that if there were other irregularities with which Jackson is not charged here, all three were equally involved. For the purpose of the charges here, it is sufficient to say that neither corporation obtained a permit from the commissioner of corporations in the state of California, and that Ltd. installed itself in a place of business on W. Pico Street in the city of Los Angeles and commenced

to manufacture lamps, or appeared to be doing so, and that Strong, Bristow and appellant were all active in its affairs.

It appears also that Vickers knew Jackson, and it is undoubtedly inferable, although there is no direct evidence on the subject, that Jackson at some time or other or perhaps on many occasions, convinced Vickers that the lamp enterprise was going to light the way for himself and his associates and anyone, who cared to participate, to an economic paradise. Be that as it may, and other than this fact or inference, with the exception of a few other circumstances, which will hereafter be made clear, there is absolutely nothing in the record to directly or inferentially connect appellant with the chain of events which took place after Miss Frost, as the excerpts from her testimony show, instructed Vickers to look into the lamp proposition.·

Miss Frost testified: "I asked Mr. Vickers to look into it (the lamp enterprise), as I had lost quite a bit of money in making up the annuity on my bonds and different securities, and I could not afford to lose any more. He looked it up and said it was a *bona fide* company, and on a paying basis, and I at that time trusted him, and entered the company."

Again she testified: "Q. By Mr. Blalock: What did Mr. Vickers say about that corporation? A. That it was a very fine corporation, and that it was making money, because there were good men in it, and he thought it would be advisable for me to put my mortgage money into that to accumulate sufficiently to make an annuity for my cousins." Further, she testified: "Q. And how did you make your first investment in the Ultra-Violet Corporation, by cash or by check? A. By a check to Dr. Strong. Q. And at whose suggestion, if anyone's did you write the check to Dr. Strong? A. Mr. Vickers. Q. Had you up to that time, seen or talked with Dr. Strong? A. Yes. Q. When had you first talked to him? A. I went with Mr. Vickers over to his sanitarium. . . . Q. After you made that visit to Dr. Strong, how long a time elapsed before you wrote your first check for an investment in the Ultra-Violet Corporation? A. I cannot say positively, but within two or three or four weeks. Q. Did you have a conversation with Mr. Vickers with reference to what you were to get for your money in the Ultra-Violet Corporation? A. Yes. Q. What did Mr. Vickers tell you? A. They brought me a written copy of what was to be given to me."

The "written copy" referred to by the witness is a letter dated May 2, 1932, in words and figures as follows, to wit:

"Pasadena, California, May 2, 1932.

"Dr. Frederick Finch Strong,

"Hollywood, California.

"Dear Sir: In recognition of the splendid discoveries you have made in your researches for the prevention and cure of disease, especially as represented by your invention, the Cold-Ray Ultra-Violet Lamp, I am joining with you in your undertaking to make your invention as widely available as possible to the suffering.

"I propose to participate with you in the organization of the Ultra-Violet Corporation, Ltd., and in the organization of its board of directors on the following conditions:

"(1) That Mr. W. A. Vickers shall, at all times, have your full support for his election and re-election as a director of the corporation from year to year.

"(2) That I shall receive from you fifteen thousand $15,-000.00) dollars par value of the shares of the corporation now standing in your name, personally owned, and the said fifteen thousand ($15,000.00) dollars par value is represented by six (600) hundred shares of a par value of twenty-five ($25.00) dollars each, and I understand that all of the shares of the corporation are common shares, and that the shares I am receiving are a part of a certain sixty per cent (60%) of the stock of the corporation, received by you in consideration of licenses to manufacture under rights of patents applied for.

"(3) I will at all times co-operate with the board of directors of the Ultra-Violet Corporation, Ltd., and if, at any time hereafter, the said board of directors shall deem it for the best interests of the corporation, to make application to the Corporation Commissioner of California, or any other state, for a permit to sell said corporation's securities, I will, in that event place my said six hundred (600) shares in escrow with your own shares, and the shares of the other stockholders of the corporation, in any bank which the board of directors of the corporation may elect, there to be subject to the Corporation Commissioner's order.

"On the foregoing conditions I am placing at your disposal the sum of Seven Thousand, Five Hundred ($7,500.00) Dollars, whereof you have already received Fifteen Hundred ($1500.00) Dollars, and Six Thousand ($6,000.00) Dollars are

herewith. On your signed acceptance hereof, this letter will constitute a contract.

> "Sincerely yours,
> "ELIZABETH A. FROST.

"Accepted:
"FREDERICK FINCH STRONG."

As the foregoing instrument shows, Miss Frost had prior to the date of the letter transmitted to Dr. Strong two checks, one for $1,000 dated March 7, 1932, and another for $500 shortly thereafter. The checks in question were not only delivered by Vickers to Strong, but were actually written by Vickers and signed by Frost.

As to Jackson's participation in these payments, or in anything leading up to them, Miss Frost herself testified as follows:

"Q. By Mr. Blalock: Did you talk with Mr. Jackson concerning the Ultra-Violet Corporation before you put any money into that corporation? A. No. Q. Who had you talked to first concerning it then? A. There was a general conversation with Mr. Whitehorne, Mr. Vickers and Mr. Jackson. Q. Did you talk to Mr. Jackson then? A. He said nothing— Q. Was Mr. Jackson present at a time when you talked about the Ultra-Violet Corporation— A. Yes. Q. —before you put any money in it? A. No."

To obtain a clear grasp of the facts with reference to the letter of May 2d, it is necessary to analyze the evidence of the defense and particularly that of Jackson, as the prosecution evidence is vague on the subject, Miss Frost herself testifying that she couldn't "recall" whether this letter was delivered to her by Vickers or Jackson. Vickers testified he delivered it to her. Jackson testified, however, and the testimony of other witnesses, including prosecution witnesses, corroborates his version, that after reading the letter of May 2d, and receiving a request from Vickers for $2,000 (which request for $2,000 will be referred to hereafter in more detail), of the check that was referred to in the letter, he refused to handle the money at all, on the basis set forth in the letter; that he drafted a new letter dated May 4th, which recited the investment of $1,000 and $500 previously made by Miss Frost, acknowledged the receipt of an additional $4,000 and not $6,000, recited that there was a balance of $2,000 still to be paid on account of the $7,500 investment promised by Miss

Frost and said nothing whatever about the sale of any stock, by Strong, the Nevada corporations, or anyone else to Miss Frost but referred to a "joint-undertaking" Miss Frost was making with those interested in the promotion of the lamps. The original of this May 4th letter was addressed to Strong by Miss Frost, signed by Miss Frost and accepted by Dr. Strong. Jackson's name was also signed to the acceptance. This second letter was intentionally destroyed by Miss Frost. She testified she tore it up and threw it in the waste basket. At the time Jackson returned the first letter and presented the second, he testified, and there is no denial of his testimony, that:

"I told Miss Frost that Dr. Strong had passed along to me . . . her check for $6710.15 . . . and that I had been asked by Mr. Vickers for $2710.15 in change, and that I could not accept her tender because it represented only $4000, whereas the instrument I had in my hand represented $6000, and for the further reason that this letter of May 2nd represents a stock transaction, wherewith we could have nothing to do. . . . I said that if she wished us to accept the $4000 on account, that it would be necessary for her to cancel this instrument and execute a new one. Q. Did she cancel it? A. She did. Q. Did she execute a new instrument? A. She did."

The original of the letter of May 4th, held by Miss Frost and Strong, was not produced, and Jackson introduced a copy which he retained.

It clearly appears from the evidence which has been but scantily quoted that Miss Frost had been persuaded by Vickers and Vickers alone that it would be a good thing to invest up to a total of $7,500 in the lamp enterprise, and on this feature of the case, Miss Frost testified in part as follows:

"Q. . . . Now, Miss Frost, going back to the time when someone spoke to you about the Ultra-Violet, who was it, the first one that spoke to you about that? A. As near as I can recall, it was Mr. Vickers. In fact, I know it was Mr. Vickers. Q. Did he bring up the subject himself, or how was it brought up? A. I knew nothing about the Ultra-Violet ray. He asked me to go over and see Dr. Strong's wonderful sanitarium, and I had been helped very materially by those lights myself, and I suppose I was a little more susceptible to going into that when they told me it was such a wonderful institu-

tion, and on a paying basis, and the company was here in California. Q. Mr. Vickers, then, is the first one that mentioned anything to you about the Ultra-Violet ray? A. Yes. . . . A. Mr. Vickers was principally the one I confided in, about going into it, and I sent him to look into it and see if it was an absolutely *bona fide* business proposition on a business basis, because I could not afford to lose any more money. . . . Q. . . . In reference to the Ultra-Violet Corporation, at any time did Mr. Vickers, with the exception of your asking him, give you any advice with reference to the Ultra-Violet Corporation? A. I suppose the answer would be 'Yes' wouldn't it? Q. I am asking you. A. Yes, because he did advise me to go into that corporation.''

Before the letter was written, $1500 had been paid on account of this amount, the remaining $6,000 was raised by Miss Frost by placing a mortgage on her home for approximately $6,710, the negotiations for which and the consummation of which were handled for Miss Frost exclusively by Vickers. The total check was delivered by Vickers to Dr. Strong, who endorsed it and turned it over to Jackson. Jackson deposited the same to his account and drew two checks, one for $710 and which was handed to Vickers to return to Miss Frost and one for $2,000 to Vickers which was delivered to Vickers and retained by Vickers.

Reverting to Jackson's alleged participation, Miss Frost when shown the letter of May 2, 1932, testified that she could not recall whether it was brought to her for signature by Vickers or Jackson. We do not know either, but the evidence apparently indicates that it was Vickers, and as has been stated, Vickers testified he did. As stated, it appears from the evidence that Jackson gave a check for $2,000 to Vickers. The testimony shows that Vickers demanded this check, claiming that he wanted to retain $2,000 from the investment of $7,500 in order to see how the business went, and thus to determine whether Miss Frost should put it in later. Vickers was the trusted agent of Miss Frost in the whole transaction and had a written power of attorney which he had previously displayed to appellant. She repeatedly asserted his agency and her trust in him throughout her testimony. It may very well be that Jackson had a strong suspicion that Vickers intended to retain this $2,000, but Jackson did not obtain the money from Vickers or Miss Frost. It was de-

livered to him by Dr. Strong. Nowhere is there an iota of testimony that Jackson received any part of this $2,000 and it may very well be that, in spite of his suspicions, Jackson felt that he might endanger the entire Frost investment, if he crossed swords with Vickers. That such an assumption on Jackson's part was not unfounded is demonstrated by the fact that the money that Vickers paid to the attorney, who represented him at the preliminary hearing, was advanced to Vickers by Miss Frost after the entire matter had been thrown into the lap of the district attorney, and Miss Frost put upon full notice. Furthermore, Jackson, according to his testimony, part of which has been already referred to, not only advised Miss Frost of this $2,000 check as pointed out, but had the following additional conversation with her: "Mr. Vickers states it is your desire to pay only $4,000 . . . that he should receive back in change $2,000. . . . Miss Frost says, 'He is a dear, dear boy, and he is my trusted agent. . . . Whatever Mr. Vickers does, I'm sure he does for my own best interests.'"

Furthermore, so far as appears from the evidence, the corporations in question had no corporate bank accounts. The two other checks which were delivered to Dr. Strong were by Strong turned over to Bristow and by Bristow deposited in his personal account but checked out ostensibly for the purposes of the association or the corporate purposes of Ltd. It thus appearing that Bristow, in so far as the $1500 was concerned, was acting as trustee for these funds intended for the association or corporation. The evidence is uncontradicted that Strong with reference to $4,000 of Miss Frost's money and other moneys obtained from third persons, handed them over to Jackson, who deposited such funds in a personal account but disbursed the same for association or corporate purposes in the same way. There is not any credible evidence to show that Jackson converted any of this money for his own purposes.

It is difficult for us to understand why Jackson was singled out for the instant prosecution. Strong was repeatedly ensnared in contradictions and on numerous other occasions voluntarily corrected himself before his attention was directed to other contradictions. Strong at first did not know or remember whether he personally received the three checks in question; who, if anyone, brought them to him; whether he

had ever met Miss Frost or had a conversation with her; or whether he had ever seen or signed the letter of May 2d. After referring to "numerous notebooks" and repeatedly in his testimony offering in explanation of the vagueness thereof his lack of business acumen, he remembers that it was Vickers who brought the checks, that he did meet Miss Frost and that he did have a conversation with her prior to the time a single cent was invested with him, and that he not only saw the letter of May 2, 1932, but actually signed it. With reference to the checks and why he turned them over to Jackson, Strong testified:

"A. I was simply a go-between, simply an agent, and it was to be endorsed by me so it could be turned over to Mr. Bristow, in order to have the matter in good faith and show the two names, the names of the patentee and the manufacturer. Q. And it was agreed that your name was to be on the checks, is that it? A. That was the understanding; otherwise I would not be on the check at all. Q. That was the understanding you had with Mr. Bristow? A. No, the understanding I had with all of them, Bristow, Jackson and Vickers. Q. Was there anything said as to why it should be put in your name? A. Yes, on account of that letter that Miss Frost wrote me, which is introduced in evidence. Q. Was that letter written to you before those checks were paid to you? A. I could not tell you."

Much more could be said about Strong and his testimony. The record also demonstrates that Bristow's participation will not bear rigid scrutiny, but it is unnecessary to the disposition of this case to go into these phases of the evidence.

Accepting the letter of May 2d as the basis of the transaction, in spite of the avalanche of evidence introduced by the defense that there was no stock sold, but that the appellant, Miss Frost and others were joint venturers, independent of the two corporations and without reference to them, in the promotion of the lamps, there is no showing whatsoever that Strong did not have personally owned stock in the Nevada corporation issued to him, which he could have delivered. If anything, the evidence shows the contrary. Strong testified:

"A. Answering to the best of my knowledge, according to the best of my knowledge, there was some stock issued to me, as consideration for the license that the Radiant Holding

Company granted to the Ultra-Violet Corporation, and that stock has never been sold or taken off the stock book. Q. Was it ever delivered to you? A. I think it is in the stock book. Q. Was it ever delivered to you? A. No.''

Further testimony showed that no demand was ever made for the stock, and there is no showing whatsoever that Strong could not have delivered the stock. If Strong personally had and owned a block of stock in the Nevada corporation which he could deliver, he had a right to sell a portion of it without a permit. (*People* v. *Pace,* 73 Cal. App. 548 [238 Pac. 1089]; *Clover* v. *Jackson,* 81 Cal. App. 55 [253 Pac. 187].) There was no showing by the prosecution that Radiant granted an exclusive license to Ltd. to manufacture and sell the lamps. It might very well be that no such exclusive license was granted. If there was no exclusive license to Ltd. then there was no legal reason why Frost, appellant, Strong, Bristow and the others mentioned could not associate in a joint venture or partnership for the exploitation of these lamps with the permission of Radiant. There is no showing that Radiant objected, rather the evidence compels a contrary inference since all the organizers and officers of Radiant, as well as of Ltd., were participating in the joint venture.

Commenting on the motion to dismiss made by appellant at the conclusion of the People's case, the trial judge addressed a question to the deputy district attorney, in which he said: ''As I remember the evidence, it shows that Mr. Vickers was Miss Frost's agent, and that she authorized him to pay this money into the business. I don't use the word 'corporation', because as I remember, the evidence is rather unsatisfactory as to the nature of this business . . . I got the idea that what she was doing was paying the money over to Dr. Strong, as she thought, for the purpose of investment in a business that was about to be established. I may be wrong on that, and I am not very confident that that is a correct statement, but she did that through Mr. Vickers as her agent. I think she used the expression 'her trusted agent', at one time. What I want to know now is what connection has Jackson with that?''

The court is still uninformed as to what connection Jackson had with *that,* or what it was that Jackson did that subjected him to the instant prosecution. We hold that the evi-

dence is insufficient to sustain a conviction on the two charges on which appellant was convicted.

The judgment and order are reversed.

Conrey, P. J., and York, J., concurred.