[Crim. No. 2976. Second Appellate District, Division Two.—June 7, 1937.]

THE PEOPLE, Respondent, v. NOEL DAVENPORT, Appellant.

Morris Lavine for Appellant.

U. S. Webb, Attorney-General, Walter L. Bowers, Deputy Attorney-General, Buron Fitts, District Attorney, and A. H. Van Cott, Deputy District Attorney, for Respondent.

McCOMB, J.—Defendant appeals from judgments and sentences pronounced by the superior court after his plea of guilty to ten counts of a complaint charging him with violations of the Corporate Securities Act.

The essentials facts are these:

Defendant entered a plea of guilty in the Municipal Court of the City of Long Beach to ten counts of a complaint charging him with violations of the Corporate Securities Act. That court thereupon certified the proceedings to the Superior Court of Los Angeles County, in which court judgment and sentence on each count were pronounced.

A.

Count XIII read as follows:

"That on or about the 29th day of March, 1934, at and in the County of Los Angeles, State of California, the crime of Violation Corporate Securities Act, a felony, was committed by Noel Davenport and Lyle H. Lee, who, at the time and place aforesaid, did wilfully, unlawfully, feloniously and knowingly issue and sell, and cause to be sold to Margaret Nelson, a security for value, to-wit, an investment contract entitled 'Agreement Noel Davenport and Margaret Nelson', without having first secured a permit from the Commissioner of Corporations of the State of California so to do."

Except as to dates and names, counts XV, XVII, XIX and XXI were identical.

### B.

Count XIV read as follows:

"That the appellant 'did willfully, unlawfully and feloniously engage in part in the business of purchasing a security issued by another, with the purpose of reselling such security, to-wit the said Noel Davenport and Lyle H. Lee purchased from Alexander Husband and Mabel C. Husband Mutual Building and Loan Association certificates Nos. 5456 and 5558, of the aggregate face value of $2443.00 with the purpose of selling such certificates, the said defendants, Noel Davenport and Lyle H. Lee, not having first secured a broker's license from the Commissioner of Corporations of the State of California'."

Except as to dates and names, counts XVI, XVIII, XX, and XXII were identical.

Defendant relies for reversal of the judgments on the following proposition:

■ *Each of the counts as to which he entered a plea of guilty failed to state a public offense.*

This proposition is valid. As hereinabove set forth the charges against defendant of violation of the Corporate Securities Act fell into two classes.

### I.

Count XIII is an example of the first class. This count, stripped of its surplus verbiage and conclusions of the pleader, such as "unlawfully, feloniously and knowingly issue . . . ", simply charged defendant with having sold an interest in an investment contract without first having secured a permit from the commissioner of corporations of the state of California. The pleader's designation of the character of the contract is a mere conclusion, and, since there is no evidence before this court of the nature of the contract, we are unable to determine whether the investment contract was one falling within the provisions of the Corporate Securities Act or not. Therefore, since in the generic sense of the word every contract is an investment contract, and it is perfectly lawful to sell, assign, or otherwise transfer or dispose of one's rights in or to any investment contract without first securing a permit from the commissioner of corporations of the state of California, unless it falls within the class described in the Corporate Securities Act, we must, in the absence of appropriate pleadings, assume that the contract described in this

count was one, the rights of which could lawfully be sold without the seller first obtaining a permit from the commissioner of corporations. It is therefore apparent that neither count XIII, XV, XVII, XIX, nor XXI stated a public offense.

## II.

█ Count XIV is an example of the second class. Stripped of its surplus verbiage and conclusions of the pleader, such as, ''feloniously engaged in part in the business of . . . '', it simply charges defendant with having purchased a security for the purpose of reselling it without having first secured a broker's license from the commissioner of corporations of the state of California. We find nothing in the Corporate Securities Act which requires an individual to secure a broker's license before selling securities which he has purchased and owns himself. Indeed, were the act to so provide, it would be unconstitutional as depriving a citizen of the state of an inalienable right of which he may be legally deprived only by the sovereign people of the state of California, to whose will the legislative, executive and judicial departments alike must bow. The sovereign people of the state of California in the most solemn manner known to the civilized world have guaranteed to each citizen the right of acquiring and possessing property which includes the right to dispose of such property in such innocent manner as he pleases and to sell it for such price as he can obtain. (Art. I, sec. 1, Constitution of the state of California.)

The foregoing principles have been repeatedly announced and enforced by the Supreme and Appellate Courts of this state. In *Billings* v. *Hall,* 7 Cal. 1, 6, Mr. Chief Justice Murray, speaking for our Supreme Court says:

'' . . . Section first of Article I, of the Constitution of California, declares that 'all men are by nature free and independent, and have certain inalienable rights, amongst which are those of enjoying and defending life and liberty, acquiring possession, protecting property, and pursuing and obtaining safety and happiness'. This principle is as old as the Magna Carta. It lies at the foundation of every constitutional government, and is necessary to the existence of civil liberty and free institutions. It was not lightly incorporated into the Constitution of this State as one of those political dogmas designed to tickle the popular ear, and con-

veying no substantial meaning or idea; but as one of those fundamental principles of enlightened government, without a rigorous observance of which there could be neither liberty nor safety to the citizen.

"If, then, one of the primary objects of government is to enable the citizen to acquire, possess, and defend property, and this right has been guaranteed by the Constitution, how can it be impaired by legislation?"

In *Roystone Co.* v. *Darling,* 171 Cal. 526, 531 [154 Pac. 15], Mr. Justice Shaw says:

" . . . that section 1 of article I, declaring that all men possess 'certain inalienable rights', among them the right of 'acquiring, possessing, and protecting property', is a guaranty which includes the right to contract concerning the use, enjoyment, and disposition of property, and which cannot be taken away or restricted by the legislature, except by reasonable regulations made in the exercise of the police power."

In *Ex parte Quarg,* 149 Cal. 79, 80 [84 Pac. 766, 117 Am. St. Rep. 115, 9 Ann. Cas. 747, 5 L. R. A. (N. S.) 183], Mr. Justice Shaw says:

"The constitutional guaranty securing to every person the right of 'acquiring, possessing, and protecting property', refers to the right to·acquire and possess the absolute and unqualified title to every species of property recognized by law, with all the rights incidental thereto, and, in connection with the right of personal liberty, it includes the right to dispose of such property in such innocent manner as he pleases, and to sell it for such price as he can obtain in fair barter. . . . These rights are in fact inherent in every natural person, and do not depend on constitutional grant or guaranty. Under our form of government by constitution, the individual, in becoming a member of organized society, unless the constitution states otherwise, surrenders only so much of these personal rights as may be considered essential to the just and reasonable exercise of the police power in furtherance of the objects for which it exists. (Cooley on Statutory Limitations, pp. 68, 244; 1 Barbour on Rights, pp. 122, 284.)"

Again in *People* v. *Pace,* 73 Cal. App. 548, 561 [238 Pac. 1089, 1095], Mr. Justice Hahn, after quoting with approval from *Ex parte Quarg, supra,* says:

"The principle enunciated by Mr. Justice Shaw has been declared in frequent decisions and needs no additional citations. However, it is urged that the opinion in *Ex parte Quarg* is not in point, because the sale of theater tickets does not involve the 'general welfare'. It must be conceded that the ownership of a theater ticket finds its basis in the same personal right that the ownership of a bond or any other security finds its law; and if the owner of a theater ticket may sell it unhampered by legislative regulation or prohibition, we are unable to ascertain upon what theory the owner of a bond or other security may not exercise the same untrammeled right.

"The attorney-general concedes that it would invade the constitutional rights of a citizen if he were prohibited from selling his securities, which he would have the legal right to buy and possess, but contends that the law under consideration is simply a regulation, and in support of this argument cites certain cases which have sustained laws which were merely regulatory in their requirements. If the act under consideration were confined simply to a requirement that all owners of certain types of securities, before selling them, should file with some official certain information, and thereupon they would have the right to dispose of their property without any other burden or interference, the position of the attorney-general might be maintained. But this is not the situation that confronts us. The act in part provides for regulation, but also provides a power to refuse a permit, which would make absolute prohibition in the sale of one's securities. The only purpose of the act in requiring the filing of certain information in the form of a petition by a person desiring to sell securities is to lay the foundation for action by the corporation commissioner that may or may not, according to his finding, result in an absolute prohibition of the sale of his securities.

"In these days when the urge is strong upon legislative bodies to extend the paternal arm of government into the realm of economic activities, it is particularly important that courts in the exercise of the particular functions imposed upon them by the constitution, shall scrutinize with care legislation which tends to encroach upon the constitutional guaranties, to the end that the right of the individual to liberty and possession of property shall become, not a mere theory,

but shall be maintained as a practical reality. And while it is true that the increasing conflict between the rights of the individual and the general welfare of society presents oft-times difficult and perplexing problems, nevertheless courts should not and will not permit the violation of those most fundamental rights that underlie our very existence as a nation.''

The decision last cited was written in 1925. Since that time it is a matter of common knowledge that legislative bodies have not only been urged to extend, but have ''extended the paternal arm of government into the realm of economic activities'' to an extent which in 1925 would have seemed totally impossible.

It is therefore evident that it behooves the courts to scan with ever-increasing vigilance and care legislation which may have the slightest tendency to encroach upon the constitutional guaranties of our citizens and ever to bear in mind our Supreme Court's pronouncement in *Ex parte Quarg, supra,* to the effect that the constitutional guarantee securing to every person the right of acquiring, possessing, and protecting property refers to the right to possess absolutely and unqualifiedly every species of property recognized by law with all rights incidental thereto, including the right to dispose of such property in such innocent manner as he pleases, and that these rights are guaranteed to citizens of the state of California by our state Constitution.

Should we hold that the counts hereinbefore set forth charged a public offense, each and every business man in the state of California could be indicted for having committed a criminal offense, since it is impossible for any person to engage in a legitimate business enterprise without doing one or both of the acts set forth in the complaint.

For the foregoing reasons the judgments are and each is reversed. It is further ordered that defendant be discharged from custody.

Crail, P. J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 7, 1937.