[L.A. No. 28360. In Bank. May 10, 1936.]

LINCOLN W. MULKEY et al., Plaintiffs and Appellants, v.
NEIL REITMAN et al., Defendants and Respondents.

David R. Cadwell, A. L. Wirin, Fred Okrand, Joseph A. Ball and Herman F. Selvin for Plaintiffs and Appellants.

John F. Duff, Richard G. Logan, Cyril A. Coyle, James S. DeMartini, Thomas Arata, William J. Bush, Peter J. Donnici, James T. McDonald, Richard B. Morris, Brundage & Hackler, Charles K. Hackler, Julius Reich, Richard A. Bancroft, Jack Greenberg, Robert M. O'Neil, Duane B. Beeson, Seymour Farber, Robert H. Laws, Jr., Howard Nemerovski, John G. Clancy, Ephraim Margolin, Joseph B. Robison and Sol Rabkin as Amici Curiae on behalf of Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, William French Smith, Samuel O. Pruitt, Jr., Charles S. Battles, Jr., and Richard V. Jackson for Defendants and Respondents.

PEEK, J.—Plaintiffs appeal from a summary judgment entered upon the granting of a motion therefor in an action for relief under sections 51 and 52 of the Civil Code.[1] In the trial court proceedings allegations of the complaint

---

[1] Civil Code, section 51, provides as follows:

"All persons within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

Civil Code, section 52, provides as follows:

"Whoever denies, or who aides, or incites such denial, or whoever makes any discrimination, distinction or restriction on account of color, race, religion, ancestry, or national origin, contrary to the provisions of Section 51 of this code, is liable for each and every such offense for the actual damages, and two hundred fifty dollars ($250) in addition thereto, suffered by any person denied the rights provided in Section 51 of this code."

were not factually challenged, no evidence was introduced, and the only matter placed in issue was the legal sufficiency of the allegations. The motion for judgment, therefore, properly should be designated as one for judgment on the pleadings and will be so treated on appeal. In any event the allegations of the complaint stand as admitted for our purposes. (See *Davis* v. *City of Santa Ana*, 108 Cal.App.2d 669, 685 [239 P.2d 656].)

Plaintiffs' complaint sets forth that they are husband and wife, citizens of the United States and residents of the County of Orange, that they are Negroes; that defendants are the owners and managers of a certain apartment building in Orange County; that in May 1963 at least one apartment therein was unoccupied and was being offered by defendants for rent to the general public; that plaintiffs offered to rent any one of available apartments and were willing and able to do so; that defendants refused to rent any of the available apartments to plaintiffs solely on the ground that plaintiffs were Negroes; that because of such refusal plaintiffs were unable to rent a suitable place to live; that they suffered humiliation and disappointment and endured mental pain and suffering; that defendants will continue to refuse to rent to plaintiffs and other members of their race solely on the ground of such race unless restrained by order of the court; that plaintiffs have no adequate remedy at law because the discrimination practiced by defendants is also practiced by other real estate brokers, and home and apartment landlords and owners in Orange County.

The motion for judgment was made and granted solely on the ground, as stated by the trial court, "that the passage of Proposition 14 had rendered Civil Code Sections 51 and 52 upon which this action is based null and void." The reference is to the initiative measure which appeared as Proposition 14 upon the statewide ballot in the general election of 1964. Following its approval by the voters it was incorporated into the California Constitution as article I, section 26.

Plaintiffs unsuccessfully opposed the motion on the ground that article I, section 26, is void for constitutional reasons under both the state and federal Constitutions. This contention presents the sole question on appeal.

Proposition 14, as now incorporated into the California Constitution, provides in full as follows:

"Neither the State nor any subdivision or agency thereof shall deny, limit or abridge, directly or indirectly, the right of any person, who is willing or desires to sell, lease or rent any

part or all of his real property, to decline to sell, lease or rent such property to such person or persons as he, in his absolute discretion, chooses.

" 'Person' includes individuals, partnerships, corporations and other legal entities and their agents or representatives but does not include the State or any subdivision thereof with respect to the sale, lease or rental of property owned by it.

" 'Real property' consists of any interest in real property of any kind or quality, present or future, irrespective of how obtained or financed, which is used, designed, constructed, zoned or otherwise devoted to or limited for residential purposes whether as a single family dwelling or as a dwelling for two or more persons or families living together or independently of each other.

"This Article shall not apply to the obtaining of property by eminent domain pursuant to Article I, Sections 14 and 14½ of this Constitution, nor to the renting or providing of any accommodations for lodging purpose by a hotel, motel or other similar public place engaged in furnishing lodging to transient guests.

"If any part or provision of this Article, or the application thereof to any person or circumstance, is held invalid, the remainder of the Article, including the application of such part or provision to other persons or circumstances, shall not be affected thereby and shall continue in force and effect. To this end the provisions of this Article are severable." (Cal. Const., art. I, § 26.)

For reasons which hereafter appear we do not find it necessary to discuss claims of the unconstitutionality of article I, section 26, based on California constitutional provisions and law. Our resolution of the question of constitutionality is confined solely to federal constitutional considerations. ██ We note preliminarily that although we are examining a provision which, by its enactment by ballot, has been accorded state constitutional stature, the supremacy clause of the United States Constitution nevertheless compels that section 26, like any other state law, conform to federal constitutional standards before it may be enforced against persons who are entitled to protection under that Constitution. (See *Lucas* v. *Forty-Fourth General Assembly of Colorado*, 377 U.S. 713, 736-737 [84 S.Ct. 1472, 12 L.Ed.2d 632].)

██ A state enactment cannot be construed for purposes of constitutional analysis without concern for its immediate objective (*In re Petraeus* (1939) 12 Cal.2d 579, 583 [86 P.2d 343];

534

see *Griffin* v. *County School Board*, 377 U.S. 218, 231 [84 S.Ct. 1226, 12 L.Ed.2d 256]), and for its ultimate effect (*Jackson* v. *Pasadena City School Dist.* (1963) 59 Cal.2d 876, 880 [31 Cal.Rptr. 606, 382 P.2d 878]; *Gomillion* v. *Lightfoot* (1960) 364 U.S. 339, 341-343 [81 S.Ct. 125, 5 L.Ed.2d 110]; *Avery* v. *Georgia* (1953) 345 U.S. 559, 562 [73 S.Ct. 891, 97 L.Ed. 1244]; *Near* v. *Minnesota* (1931) 283 U.S. 697, 708-709 [51 S.Ct. 625, 75 L.Ed. 1357]). To determine the validity of the enactment in this respect it must be viewed in light of its historical context and the conditions existing prior to its enactment. (*Select Base Materials, Inc.* v. *Board of Equalization* (1959) 51 Cal.2d 640, 645 [335 P.2d 672]; *Evans* v. *Selma Union High School Dist.* (1924) 193 Cal. 54, 57-58 [222 P. 801, 31 A.L.R. 1121]; see *Snowden* v. *Hughes* (1944) 321 U.S. 1, 8-9 [64 S.Ct. 397, 88 L.Ed. 497].)

In 1959, the State Legislature took the first major steps toward eliminating racial discrimination in housing. The Unruh Civil Rights Act (Civ. Code, §§ 51, 52) prohibited discrimination on grounds of "race, color, religion, ancestry, or natural origin" by "business establishments of every kind." On its face, this measure encompassed the activities of real estate brokers and all businesses selling or leasing residential housing. (See *Lee* v. *O'Hara* (1962) 57 Cal.2d 476 [20 Cal. Rptr. 617, 370 P.2d 231]; *Burks* v. *Poppy Constr. Co.* (1962) 57 Cal.2d 463 [20 Cal.Rptr. 609, 370 P.2d 313].)

At the same session the Legislature passed the Hawkins Act (formerly Health & Saf. Code, §§ 35700-35741) that prohibited racial discrimination in publicly assisted housing accommodations. In 1961 the Legislature broadened its attempt to discourage segregated housing by enacting proscriptions against discriminatory restrictive covenants affecting real property interests (Civ. Code, § 53) and racially restrictive conditions in deeds of real property (Civ. Code, § 782).

Finally in 1963 the State Legislature superseded the Hawkins Act by passing the Rumford Fair Housing Act. (Health & Saf. Code, §§ 35700-35744.) The Rumford Act provided that "The practice of discrimination because of race, color, religion, natural origin, or ancestry is declared to be against public policy" and prohibited such discrimination in the sale or rental of any private dwelling containing more than four units. The State Fair Employment Practice Commission was empowered to prevent violations.

Proposition 14 was enacted against the foregoing historical background with the clear intent to overturn state laws that bore on the right of private sellers and lessors to discrimi-

nate, and to forestall future state action that might circumscribe this right. In short, Proposition 14 generally nullifies both the Rumford and Unruh Acts as they apply to the housing market.

Prior to its enactment the unconstitutionality of Proposition 14 was urged to this court in *Lewis* v. *Jordan,* Sac. 7549 (June 3, 1964). In rejecting the petition for mandamus to keep that proposition off the ballot we stated in our minute order ''that it would be more appropriate to pass on those questions after the election . . . than to interfere with the power of the people to propose laws and amendments to the Constitution and to adopt or reject the same at the polls. . . .'' But we further noted in the order that ''there are grave questions whether the proposed amendment to the California Constitution is valid under the Fourteenth Amendment to the United States Constitution. . . .'' We are now confronted with those questions.

Plaintiffs' basic contention is that the foregoing provision cannot constitutionally withstand the mandate contained in section 1 of the Fourteenth Amendment to the United States Constitution that no state shall ''deny to any person within its jurisdiction the equal protection of the laws.'' Thus, the constitutional proscription invoked is twofold. First, it is a limitation on state, as distinguished from private action and, second, it directs that such state action, where undertaken, meet certain minimum standards. If we assume for the moment that the state has undertaken to act in these circumstances, then the pertinent issue becomes whether such action accords equal protection of the laws to plaintiffs. We consider such issue initially.

 It is now beyond dispute that ''. . . among the civil rights intended to be protected from discriminatory state action by the Fourteenth Amendment are the rights to acquire, enjoy, own and dispose of property. Equality in the enjoyment of property rights was regarded by the framers of that Amendment as an essential pre-condition to the realization of other basic civil rights and liberties which the Amendment was intended to guarantee.'' (*Shelley* v. *Kraemer,* 334 U.S. 1, 10 [68 S.Ct. 836, 92 L.Ed. 1161, 3 A.L.R.2d 441] ; see also *Buchanan* v. *Warley* (1917) 245 U.S. 60 [38 S.Ct. 16, 62 L.Ed. 149] ; *Brown* v. *Board of Education* (1954) 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180] ; *Barrows* v. *Jackson* (1953) 346 U.S. 249 [73 S.Ct. 1031, 97 L.Ed. 1586] ; *Jackson* v. *Pasadena City School Dist.* (1963) *supra,* 59 Cal.2d

876; *Sei Fujii* v. *State of California* (1952) 38 Cal.2d 718 [242 P.2d 617].)

The question of the fact of discrimination, by whatever hand, should give us little pause. The very nature of the instant action and the specific contentions urged by the defendants must be deemed to constitute concessions on their part that article I, section 26, provides for nothing more than a purported constitutional right to *privately* discriminate on grounds which admittedly would be unavailable under the Fourteenth Amendment *should state action* be involved. Thus, as a complete and only answer to plaintiffs' allegations which irrefutably establish a discriminatory act, defendants urge that section 26 accords them the right as private citizens to so discriminate. The only real question thus remaining is whether the discrimination results solely from the claimed private action or instead results at least in part from state action which is sufficiently involved to bring the matter within the proscription of the Fourteenth Amendment. For the reasons stated below we have concluded that state action is sufficiently involved to fall within the reach of the constitutional prohibition.

The parties generally concede that in an organized and regulated society the state or its subdivisions play some part in most, if not all, so-called private transactions, and it must be acknowledged, without specifically enumerating them, that many of the rights and duties arising out of the transfer of an interest in real property are related to or dependent upon the state or local governments. But it is not the mere fact that in some manner the state is involved, however remotely, with which we are concerned. It is only where the state is significantly involved that the prohibitions of the equal protection clause are invoked. The Supreme Court in *Burton* v. *Wilmington Parking Authority* (1961) 365 U.S. 715, stated the proposition in the following language at page 722 [81 S.Ct. 856, 6 L.Ed.2d 45] : ". . . private conduct abridging individual rights does no violence to the Equal Protection Clause unless to some significant extent the State in any of its manifestations has been found to have been involved in it." That proscribed state involvement is not to be limited to direct conduct on the part of its employees, agents and representatives is made apparent by the court's further statement at page 722 : "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." More recently the Supreme Court has stated : "Conduct that is formally 'private' may

become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." (*Evans* v. *Newton* (1966) 382 U.S. 296 [86 S.Ct. 486, 15 L.Ed.2d 373].)

However subtle may be the state conduct which is deemed "significant," it must nevertheless constitute action rather than inaction. The equal protection clause and, in fact, the whole of the Fourteenth Amendment, is prohibitory in nature and we are not prepared to hold, as has been urged, that it has been or should be construed to impose upon the state an obligation to take positive action in an area where it is not otherwise committed to act. Urged in support of such proposition is *James* v. *Marinship Corporation*, 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900]. But the prior state commitment in that case is clear. We held that a so-called private labor union could not racially discriminate against those who wished to become members, but we first concluded that the union, because it had obtained a monopoly on the labor supply, was like a public service business which, under the law of the state, was precluded from discriminating on the basis of race. Likewise, in *Jackson* v. *Pasadena City School Dist.*, *supra*, 59 Cal.2d 876, the state, because it had undertaken through school districts to provide educational facilities to the youth of the state, was required to do so in a manner which avoided segregation and unreasonable racial imbalance in its schools.

The problem thus becomes one of ascertaining positive state action of a degree sufficient to be deemed significant in the accomplishment of the recognized and admitted discrimination.

To conclude that there is state action in the instant circumstances we are not limited to action by one who, cloaked with the authority of the state, acts as its designated representative. In the broad sense, state action has been consistently found where the state, in any meaningful way, has lent its processes to the achievement of discrimination even though that goal was not within the state's purpose. Thus, state conduct has been found in the action of a trial court in enforcing a privately created restrictive covenant which prevented a sale of real property to a Negro buyer. (*Shelley* v. *Kraemer, supra,* 334 U.S. 1.) In that case the court stated at page 14: ". . . [T]he Amendment makes void 'State action of every kind' which is inconsistent with the guaranties therein contained, and extends to manifestations of 'State authority in the shape

of laws, customs, or judicial or executive proceedings.' '' In applying the *Shelley* reasoning that the processes of the court cannot be utilized to accomplish a private discrimination, it has been held reversible error to exclude evidence that the plaintiff landlord in an eviction proceeding was motivated purely by racial considerations, although the defendant tenant was admittedly in default. (*Abstract Investment Co.* v. *Hutchinson*, 204 Cal.App.2d 242 [22 Cal.Rptr. 309].)

*Shelley*, and the cases which follow it, stand for the proposition that when one who seeks to discriminate solicits and obtains the aid of the court in the accomplishment of that discrimination, significant state action, within the proscription of the equal protection clause, is involved. The instant case may be distinguished from the *Shelley* and the *Abstract* cases only in that those who would discriminate here are not *seeking* the aid of the court to that end. Instead they are in court only because they have been summoned there by those against whom they seek to discriminate. The court is not asked to enforce a covenant nor to eject a tenant, but only to render judgment denying the relief sought in accordance with the law of the state. Thus, it is contended by defendants that the isolated act of rendering such a judgment does not significantly involve the state in the prior act of discrimination.

It must be recognized that the application of *Shelley* is not limited to state involvement only through court proceedings. In the broader sense the prohibition extends to any racially discriminatory act accomplished through the significant aid of any state agency, even where the actor is a private citizen motivated by purely personal interests. (See *Burton* v. *Wilmington Parking Authority, supra*, 365 U.S. 715, 722.) Thus, in *Marsh* v. *Alabama,* 326 U.S. 501 [66 S.Ct. 276, 90 L.Ed. 265], an entire town was owned by a purely private company, the agents of which caused the arrest for trespass of persons engaged in exercising their constitutional freedom of speech. Although no governmental officials or agents were involved, the Supreme Court found sufficient state action to invoke the Fourteenth Amendment. This was based on the view that the company managers were performing a governmental function of managing and controlling a town wherein persons resided who were entitled to Fourteenth Amendment protections: ''. . . In our view the circumstance that the property rights to the premises where the deprivation of liberty, here involved, took place, where held by others than the public, is not sufficient to justify the State's permitting a corporation to govern a community of citizens so as to restrict their fundamental

liberties. . . ." (*Marsh* v. *Alabama, supra,* at p. 509.) There, as contended by defendants in the instant case, the state did not participate except to condone private action.

Even more applicable in the instant circumstances are the so-called "white primary cases." (*Smith* v. *Allwright,* 321 U.S. 649 [64 S.Ct. 757, 88 L.Ed. 987, 151 A.L.R. 1110]; *Terry* v. *Adams,* 345 U.S. 461 [73 S.Ct.. 809, 97 L.Ed. 1152]; *Nixon* v. *Condon,* 286 U.S. 73 [52 S.Ct. 484, 76 L.Ed. 984, 88 A.L.R. 458]; *Baskin* v. *Brown,* 174 F.2d 391; *Rice* v. *Elmore,* 165 F.2d 387.) In those cases private action infringing the right to vote was held to be the equivalent of state action where accomplished with the culpable permission of the state. In *Nixon* v. *Condon, supra,* 286 U.S. 73, for instance, a state statute which forbade voting by Negroes in primaries was declared to be unconstitutional. It was thereupon repealed and a substitute measure enacted which was wholly permissive, that is, political parties were allowed to prescribe the qualifications for membership and voting rights in the party's primaries. A local political party thereafter barred Negroes from voting in its primaries and it was held that the permissive private action was chargeable as state action. (See also *Baskin* v. *Brown, supra,* 174 F.2d 391, 394.)

A similar abdication of a traditional governmental function for the obvious purpose of condoning its performance under color of private action has recently been struck down by the Supreme Court in *Evans* v. *Newton, supra,* 382 U.S. 296. There, a park for the enjoyment of white persons was owned, managed and maintained by the City of Macon, Georgia, as trustee under the 1911 will of Senator August Bacon. When a question was raised whether the city could continue to maintain the segregated park consistent with the equal protection clause, it purported to transfer the park to private trustees with the intent that it would continue to be maintained for the enjoyment of white persons only. The foregoing conduct on the part of the municipality was held to be proscribed by the Fourteenth Amendment.

It is contended by defendants, however, that the foregoing cases, in the main, involved some recognized governmental function which, although undertaken by private persons, nevertheless was required to be performed in the same non-discriminatory manner as would be required in the case of performance by the state. Such contention fails to recognize the basic issue involved. Those cases are concerned not so much with the *nature* of the function involved as they are with *who*

is responsible for conduct in performance of that function. If the function is traditionally governmental in nature unquestionably the state is responsible. But this cannot be the only instance wherein the state assumes responsibility—it is also responsible when, as we have stated, it becomes significantly involved in *any* discriminatory conduct. (See *Burton* v. *Wilmington Parking Authority, supra,* 365 U.S. 715, 722.)

Going to the question of what constitutes significant involvement, it is established that even where the state can be charged with only encouraging discriminatory conduct, the color of state action nevertheless attaches. Justice Black, in writing for the majority in *Robinson* v. *Florida,* 378 U.S. 153, 156 [84 S.Ct. 1693, 12 L.Ed.2d 771], and for the dissenters in *Bell* v. *Maryland,* 378 U.S. 226, 334 [84 S.Ct. 1814, 12 L.Ed.2d 822], asserted that private racial discrimination violates the Fourteenth Amendment once the state in any way discourages integration or instigates or encourages segregation. In *Barrows* v. *Jackson, supra,* 346 U.S. 249, in holding that a racially restrictive covenant could not constitutionally support a suit for damages, the court explained at page 254: ''The result of that sanction by the State would be to encourage the use of restrictive covenants. To that extent, the State would act to put its sanction behind the covenants. If the State may thus punish respondent for her failure to carry out her covenant, she is coerced to continue to use her property in a discriminatory manner, which in essence is the purpose of the covenant. Thus, it becomes not respondent's voluntary choice but the State's choice that she observe her covenant or suffer damages.''

Proscribed governmental encouragement of private discrimination has not been confined to the courts. *Anderson* v. *Martin,* 375 U.S. 399 [84 S.Ct. 454, 11 L.Ed.2d 430], involved racial labeling of candidates on ballots. Although the state practice did not *require* discrimination on the part of individual voters, it was struck down because it *encouraged* and assisted in discrimination. (See also *Baldwin* v. *Morgan,* 287 F.2d 750.) Similarly, as early as 1914, in *McCabe* v. *Atchison T. & S.F. Ry.,* 235 U.S. 151, it was stated at page 162 [35 S.Ct. 69, 59 L.Ed. 169] that the denial of equal railroad facilities to Negroes by a private railroad was unconstitutional state action on the ground that the right to discriminate was authorized by a local statute and that should the carrier perpetrate such discrimination it would be acting under ''the authority of a state law.'' The court reasoned that state *authorization* to discriminate was no less state action than state *imposed* dis-

crimination. (See also *Boman* v. *Birmingham Transit Co.,* 280 F.2d 531.)

The Supreme Court has recently spoken out against state action which only authorizes "private" discrimination. In *Burton* v. *Wilmington Parking Authority, supra,* 365 U.S. 715, the court had before it the question of whether the State of Delaware discriminated against a Negro who was excluded from a privately-operated restaurant leased from a public agency of that state. The court stated at page 725 that the state "not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination. The State has so far insinuated itself into a position of interdependence . . . that it must be recognized as a joint participant in the challenged activity. . . ." In a concurring opinion Justice Stewart, concluding that the state enactment involved, as construed by the state court, *authorized* discrimination, stated at page 727 : "I think, therefore, that the appeal was properly taken, and that the statute, as authoritatively construed by the Supreme Court of Delaware, is constitutionally invalid." Even the dissenting justices agreed that if the state court had construed the state enactment as authorizing racial discrimination, there was a denial by the state of equal protection of the laws, Justice Frankfurter stating at page 727 : 'For a State to place its authority behind discriminatory treatment based solely on color is indubitably a denial by a State of the equal protection of the laws, in violation of the Fourteenth Amendment."

In a case involving a fact situation similar to *Burton,* and clearly pertinent to our present inquiry, a Tennessee statute renounced the state's common law cause of action for exclusion from hotels and other public places and declared that operators of such establishments were free to exclude persons for any reason whatever. In the particular circumstances of that case the statute was deemed to bear on the issues "only insofar as" it "expressed an affirmative state policy fostering segregation." The court stated that: "our decisions have foreclosed any possible contention that such a statute . . . may stand consistently with the Fourteenth Amendment." (*Turner* v. *City of Memphis* (1962) 369 U.S. 350, 353 [82 S.Ct. 805, 7 L.Ed.2d 762].)

The instant case presents an undeniably analogous situation wherein the state, recognizing that it could not perform a direct act of discrimination, nevertheless has taken affirmative action of a legislative nature designed to make possible private discriminatory practices which previously were legally restric-

ted. We cannot realistically conclude that, because the final act of discrimination is undertaken by a private party motivated only by personal economic or social considerations, we must close our eyes and ears to the events which purport to make the final act legally possible. Here the state has affirmatively acted to change its existing laws from a situation wherein the discrimination practiced was legally restricted to one wherein it is encouraged, within the meaning of the cited decisions. Certainly the act of which complaint is made is as much, if not more, the legislative action which authorized private discrimination as it is the final, private act of discrimination itself. Where the state can be said to act, as it does of course, through the laws approved by legislators elected by the popular vote, it must also be held to act through a law adopted directly by the popular vote. When the electorate assumes to exercise the law-making function, then the electorate is as much a state agency as any of its elected officials. It is thus apparent that, while state action may take many forms, the test is not the novelty of the form but rather the ultimate result which is achieved through the aid of state processes. And if discrimination is thus accomplished, the nature of proscribed state action must not be limited by the ingenuity of those who would seek to conceal it by subtleties and claims of neutrality.

Contrary to defendants' claims, the state's abstinence from making the decision to discriminate in a particular instance does not confer upon it the status of neutrality in these circumstances. Justice Byron R. White's view of the facts in *Evans* v. *Newton, supra,* 382 U.S. 296, poses an almost identical issue to that here presented. In his view the majority in *Evans* were not justified on the record in concluding that the City of Macon was continuing to operate and maintain the park there involved after transfer to private trustees, and he grounded his conclusion of proscribed state action on 1905 legislation which did not compel but would nevertheless make it possible for the maintenance of segregated private parks for either white or colored persons. His reasoning and resolution of the issue are stated at page 306 [15 L.Ed.2d at p. 381] in the following language: ''As this legislation does not compel a trust settlor to condition his grant upon use only by a racially designated class, the State cannot be said to have directly coerced private discrimination. Nevertheless, if the validity of the racial condition in Senator Bacon's trust would have been in doubt but for the 1905 statute and if the statute removed such doubt only for racial restrictions, leaving the validity of

nonracial restrictions still in question, the absence of coercive language in the legislation would not prevent application of the Fourteenth Amendment. For such a statute would depart from a policy of strict neutrality in matters of private discrimination by enlisting the State's assistance only in aid of racial discrimination and would so involve the State in the private choice as to convert the infected private discrimination into state action subject to the Fourteenth Amendment.''

From the foregoing it is apparent that the state is at least a partner in the instant act of discrimination and that its conduct is not beyond the reach of the Fourteenth Amendment.

The question remains whether section 26 in whole or in part must be struck down. It is argued, and with merit, that in many applications no unconstitutional discrimination will result and, as noted, it is specifically provided in the amendment that ''If any part or provision of this Article, or the application thereof to any person or circumstance, is held invalid, the remainder of the Article, including the application of such part or provision to other persons or circumstances, shall not be affected thereby and shall continue in full force and effect. To this end the provisions of this Article are severable.'' Does such severability clause save the amendment for piecemeal judicial scrutiny as specific instances of its application arise?

We have recognized that a statute which has unconstitutional applications may nevertheless be effective in those instances where the Constitution is not offended. (See *Franklin Life Ins. Co.* v. *State of California* (1965) 63 Cal.2d 222 [45 Cal.Rptr. 869, 404 P.2d 477].) In the *Franklin* case a taxing statute was held to have been properly applied despite the ''possibility of hypothesizing an unconstitutional application of the statute.'' (P. 227.) But in refusing to declare the statute unconstitutional on its face, we stated at pages 227-228: ''. . . [W]hen the application of the statute is invalid in certain situations we cannot enforce it in other situations if such enforcement entails the danger of an uncertain or vague future application of the statute [citations]. We have been particularly aware of fomenting such danger of uncertainty in the application of a statute which would inhibit the exercise of a constitutional right (*In re Blaney, supra*) or impose criminal liability. . . . As the United States Supreme Court has said in rejecting an argument that a statute violative of the Fifth Amendment could be constitutionally applied to the case before it, such a 'course would not be proper, or desirable, in

dealing with a section which so severely curtails personal liberty.' [Citations.]'' (See also *Thornhill* v. *Alabama,* 310 U.S. 88 [60 S.Ct. 736, 84 L.Ed. 1093]; *Carlson* v. *California,* 310 U.S. 106 [60 S.Ct. 746, 84 L.Ed. 1104]; *Jones* v. *Opelika,* 319 U.S. 103 [83 S.Ct. 890, 87 L.Ed. 1290].)

The instant case, of course, relates directly to the personal liberties distinguished in *Franklin.* This was also true in the case of *In re Blaney* (1947) 30 Cal.2d 643 [184 P.2d 892], referred to in *Franklin.* In the *Blaney* case the ''Hot Cargo Act,'' which declared secondary boycotts unlawful, was struck down on the ground that in some instances sympathetic strikes and other labor coercion could not be constitutionally restrained, although it was recognized that in other instances the statute could be lawfully applied. The court held that the provisions of the statute did not differentiate between the constitutional and unconstitutional applications, stating that ''The only way in which such segregation could be made would be by judicial interpretation, first holding that the act as it stands is wholly unconstitutional, but then determining that, by inserting qualifications and exceptions in the statutory language, a judicially reformed statute might be given some effect.'' (*In re Blaney, supra,* 30 Cal.2d 643, 655.) We further held in *Blaney* that a severability clause is ineffective to sustain valid portions or applications of a statute unless ''. . . the language of the statute is mechanically severable, that is, where the valid and invalid parts can be separated by paragraph, sentence, clause, phrase, or even single words,'' and that where the statute is not so severable ''. . . then the void part taints the remainder and the whole becomes a nullity.'' (P. 655.)

It is immediately apparent from the operative portion of the instant constitutional amendment that it is mechanically impossible to differentiate between those portions or applications of the amendment which would preserve the right to discriminate on the basis of race, color or creed, as distinguished from a proper basis for discrimination. The purported preservation of the right to discriminate on whatever basis is fully integrated and, under the rule of *Blaney,* not severable. Moreover, while we can conceive of no other purpose for an application of section 26 aside from authorizing the perpetration of a purported private discrimination where such authorization or right to discriminate does not otherwise exist, any such other purpose clearly ''entails the danger of an uncertain or vague future application of the [enactment]'' and would thus require that it be struck down. (*Franklin Life Ins. Co.* v.

*State of California* (1965) 63 Cal.2d 222, 227 [45 Cal.Rptr. 869, 404 P.2d 477].)

For the foregoing reasons the severability clause is ineffective in the instant case, and the whole of the constitutional amendment must be struck down.

Article I, section 26, of the California Constitution thus denied to plaintiffs and all those similarly situated the equal protection of the laws as guaranteed by the Fourteenth Amendment to the federal Constitution, and is void in its general application.

The judgment is reversed.

Traynor, C. J., Peters, J., Tobriner, J., and Burke, J., concurred.

WHITE, J.*—I dissent.

In the final analysis as I view it, the primary issue here presented is whether article I, section 26,[1] added to our state Constitution by the people as an initiative measure (Proposition 14) at the general election of November 3, 1964, by a vote of 4,526,460 to 2,395,747, is a valid exercise of state legislative power in choosing not to regulate the private conduct of residential property owners in the sale or rental of their own private property, even if that conduct is discriminatory on racial or religious grounds, or whether such a legislative choice by the people violates the provisions of the Fourteenth Amendment to the Constitution of the United States or federal law.

While the attack in the briefs on the constitutionality of section 26 encompasses some highly emotional and, I feel, inaccurate charges as to its scope, meaning and effect, such as that by its adoption California has taken "affirmative action of a definite and drastic sort . . . [amounting] to condonation or approval of race discrimination in the sale, leasing and rental of housing . . ."; that it is an "affirmative declaration that the State will never do anything to prevent or eliminate that discrimination"; that it puts "the State in direct opposition to national policy"; and that its effect is "not merely to repeal the Unruh and Rumford Acts but to authorize racial discrimination in the renting of residential property," I am

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

[1]For convenience this section of the Constitution will be referred to as section 26.

impressed, from a calm and dispassionate reading of section 26, that it is manifest that actually the measure amounts only to a legislative choice by the people acting through the power reserved to them by article IV, section 1, of our California Constitution that a particular method of attempting to solve the problem of housing for minorities, i.e., the imposition of governmental sanctions on *private residential property owners* shall not now be employed; that the state policy which existed in California prior to 1959 shall be restored; and that there be reserved to the people the exclusive legislative power to change or modify this policy.

Prior to the adoption of the Unruh Act, the California Legislature had chosen not to regulate the conduct of property owners in selecting their buyers or tenants whether or not the choice was based on race, color or creed. By the enactment of the Unruh Act in 1959, the Legislature chose to regulate racial and religious discrimination by persons in "business establishments of every kind whatsoever," including persons engaged in the business of selling or renting residential property, brokers and others. (*Burks* v. *Poppy Constr. Co.*, 57 Cal.2d 463, 468 [20 Cal.Rptr. 609, 370 P.2d 313]; *Lee* v. *O'Hara*, 57 Cal.2d 476, 478 [20 Cal.Rptr. 617, 370 P.2d 321].) From September 1963, until section 26 of article I became effective, by enacting the Rumford Act, the Legislature chose to regulate specifically such discriminating conduct by owners of most but not all residential property. Then, in November 1964, by enacting section 26 of article I of the Constitution, the people exercised their legislative prerogative and declared that the conduct of a private property owner in refusing to sell or rent his property for whatever reason, should not be regulated by the state but should be left to private self-determination, but the legislation regulating persons other than the property owner when dealing with his own property was left in full force. Nor did the adoption of section 26 interfere with or impair the nearly century-old history of legislation affecting race relations in California commencing as it did in 1872 with the enactment of legislation prohibiting innkeepers and common carriers from discriminating in making their facilities available to all races and creeds (now Pen. Code, § 365), legislation which prohibited discrimination in "public accommodations" (Stats. 1893, ch. 185, p. 220). Those provisions which became sections 51-54 of the Civil Code in 1905 and were amended in 1919 and 1923 (Stats. 1919, ch. 210, p. 309; Stats. 1923, ch. 235, p. 485) guaranteed to "All citizens . . . full and equal accommodations . . . of inns, restaurants, hotels,

eating houses . . . barber shops, bath houses, theatres, skating rinks, public conveyances, and all other places of public accommodation or amusement, subject only to the conditions and limitations established by law and applicable alike to all citizens.'' Then in 1925 and succeeding years followed statutory prohibitions against race discrimination in the employment of teachers in California school districts, in civil service, in public works employment, and assistance programs for needy and distressed persons.

In 1959 the Legislature enacted a measure popularly known as the ''Hawkins Act'' (Health & Saf. Code, §§ 35700-35741) which prohibited ''The practice of discrimination because of race, color, religion, national origin or ancestry in any *publicly assisted housing accommodations. . . .*'' (Italics added.) Also adopted at the 1959 legislative session was the California Fair Employment Practice Act (Lab. Code, §§ 1410-1432) prohibiting racial discrimination by certain employers and labor unions, thereby protecting and safeguarding the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, creed, color, national origin or ancestry. None of these guarantees against racial discrimination have been modified or impaired by the challenged constitutional amendment now engaging our attention.

In 1963 the Legislature, in enacting what is commonly known as the ''Rumford Act'' (Health & Saf. Code, §§ 35700-35744), chose to broaden the policy enunciated in the Hawkins Act, *supra*, with regard to discrimination in housing by extending the provisions of the Unruh and Hawkins Acts to regulate specifically discriminating conduct not only by persons in business establishments of every kind whatsoever, including persons engaged in the business of selling or renting residential property, brokers and others, but regulating such discriminatory conduct by owners of residential property containing more than four units even though not ''publicly assisted.'' It was this latter declared public policy only that was affected by the adoption of section 26.

I am impressed that charges made in the briefs of plaintiffs and amici curiae that the measure here under consideration was prompted by vicious motives cannot be sustained as against the clear language of the measure itself and the argument that was made to all the voters who cast their ballots at the election.

To discriminate means, insofar as applicable to the instant case, ''To make a difference in treatment or favor (of one as

548

compared with others)''; discrimination means ''. . . an unfair or injurious distinction.'' (Webster's New Internat. Dict. (2d ed. 1954).) Contrary to the statutes and laws struck down because of racial discrimination in the cases relied upon by the majority, article I, section 26, now before us, grants equal rights and protection of the law to *any person without regard to race, religion or color,* to sell, lease or rent residential real property to *any person as he chooses.* Where is there discrimination or denial of equal rights to all in this enactment?

But, says the majority opinion, ''It is now beyond dispute that the Fourteenth Amendment [Constitution of the United States], through the equal protection clause, secures 'the right to *acquire* and *possess* property of every kind . . . without discrimination on account of color, race [or] religion. . . .' (*Buchanan* v. *Warley* (1917) 245 U.S. 60, 62-63 [38 S.Ct. 16, 62 L.Ed. 149].) . . . The question of the fact of discrimination by whatever hand, should give us little pause. The very nature of the instant action and the specific contentions urged by the defendants must be deemed to constitute concessions on their part that article I, section 26, provides for nothing more than a purported constitutional right to *privately* discriminate on grounds which admittedly would be unavailable under the Fourteenth Amendment *should state action* be involved.''

The answer to that is that section 26 does not sanction or condone racial or religious discrimination. It is rather a declaration of neutrality in a relatively narrow area of human conduct: the exercise of the discretion of a property owner to sell or not to sell or to rent or not to rent his residential property.

Since it is conceded that ''Individual invasion of individual rights is not the subject-matter of the [Fourteenth] amendment'' (*Civil Rights Cases,* 109 U.S. 3, 11 [3 S.Ct. 18, 27 L.Ed. 835]), it seems to me that any sound analysis of the constitutionality of section 26 must begin with the well established, but frequently ignored, premise that the prohibitions of the Fourteenth Amendment are directed at *conduct for which the state is responsible or significantly involved* and do not extend to private conduct however wrongful, discriminatory, unethical or violative or what may be regarded by many as the real philosophy of human relations. In other words, the state must be held *responsible* for denying a citizen the equal protection of the law.

The major constitutional attack on section 26 as contained in the majority opinion would seem to begin with the falla-

cious assumption of the existence of a federal constitutional right to acquire property without racial discrimination from another citizen and leaps to the conclusion that the failure of the state to enforce that *constitutional right* inevitably involves the state in the constitutionally prohibited discrimination so significantly as to violate the Fourteenth Amendment. Nothing in the federal Constitution gives to one citizen the right to acquire property from another citizen who does not wish to sell it to him even if the refusal to sell is based on race or religion. A federal constitutional right arises only if the state is responsible for such discriminatory conduct or to some significant extent has been found to have become involved in it.

I am persuaded that in the absence of significant state involvement, the refusal of a property owner to sell or lease his property upon the grounds of race raises no federal constitutional question. As declared by the United States Supreme Court in the leading case of *Burton* v. *Wilmington Parking Authority* (1961) 365 U.S. 715, 722 [81 S.Ct. 856, 6 L.Ed.2d 45] : "[P]rivate conduct abridging individual rights does no violence to the Equal Protection Clause unless to some *significant extent* the state in any of its manifestations has been found to have become *involved* in it." (Italics added.)

And as was said by Mr. Justice Harlan in his concurring opinion in *Peterson* v. *Greenville* (1963) 373 U.S. 244, 249-250 [83 S.Ct. 1119, 10 L.Ed.2d 323, 327], "The ultimate substantive question is whether there has been 'State action of a particular character' (*Civil Rights Cases, supra* [109 U.S. at p. 11])—whether the character of the State's involvement in an arbitrary discrimination is such that it should be held *responsible* for the discrimination.

"This limitation on the scope of the prohibitions of the Fourteenth Amendment serves several vital functions in our system. Underlying the cases involving an alleged denial of equal protection by ostensibly private action is a clash of competing constitutional claims of a high order: liberty and equality. *Freedom of the individual to choose his associates or his neighbors, to use and dispose of his property as he sees fit, to be irrational, arbitrary, capricious, even unjust in his personal relations are things all entitled to a large measure of protection from governmental interference.* This liberty would be overridden, in the name of equality, if the strictures of the Amendment were applied to governmental and private action without distinction. *Also inherent in the concept of State action are values of federalism, a recognition that there are*

*areas of private rights upon which federal power should not lay a heavy hand and which should properly be left to the more precise instruments of local authority."* (Italics added.)

And since section 26, here in question, involves *residential* property, the views of Mr. Justice Douglas in his concurring opinion in *Lombard* v. *Louisiana,* 373 U.S. 267 at pp. 274-275 [83 S.Ct. 1122, 10 L.Ed.2d 338, at p. 343] (one of the 1963 sit-in decisions) are cogent:

"If this were an intrusion of a man's home or yard or farm or garden, the property owner could seek and obtain the aid of the State against the intruder. For the Bill of Rights, as applied to the States through the Due Process Clause of the Fourteenth Amendment, casts its weight on the side of the privacy of homes. The Third Amendment with its ban on the quartering of soldiers in private homes radiates that philosophy. The Fourth Amendment, while concerned with official invasions of privacy through searches and seizures, is eloquent testimony of the sanctity of private premises. For even when the police enter a private precinct they must, with rare exceptions, come armed with a warrant issued by a magistrate. A private person has no standing to obtain even limited access. The principle that a man's home is his castle is basic to our system of jurisprudence."

Plaintiffs urge that the Constitution of California (article I, section 1) declares that among the inalienable rights guaranteed to all persons is the right of ". . . acquiring, possessing and protecting property." But these rights not only include the right to acquire and possess property but also the right to dispose of it freely (*Tennant* v. *John Tennant Memorial Home,* 167 Cal. 570, 575 [140 P. 242]) and in any way not forbidden by law (*People* v. *Davenport,* 21 Cal.App.2d 292, 295-296 [69 P.2d 862]). Certainly the constitutional right to own and possess property includes the right to sell to one of the owner's own choice subject only to a valid exercise of the police power for the protection of all the people. Never to my knowledge has article I, section 1, of our state Constitution been construed to give any person the right to acquire property from another who did not wish to sell it to him, however arbitrary his reasons might be. Section 1 of article I, when read with section 26, now means exactly what it meant prior to the adoption of legislation (the Unruh and Rumford Acts, *supra*) conferring a right to acquire property in certain instances without discrimination on grounds of race or religion. It is, therefore, erroneous for plaintiffs to say that the

effect of section 26 is to "take from negroes but not from whites, some part of the inalienable rights granted by section 1." Under section 26 all persons of all races and creeds have exactly the same rights they have always had under section 1 in the absence of legislation and, to the extent any rights are restricted by section 26, such restrictions are applicable to *all* persons.

As I view it, the philosophy and rationale of article I, section 26, is epitomized by Mr. Justice Black, long an exponent of an expansive interpretation of the guarantees of the Fourth Amendment, when writing for himself and Justices Harlan and White in the dissent filed in the case of *Bell* v. *Maryland* (1964) 378 U.S. 226, 330-331 [84 S.Ct. 1814, 12 L.Ed.2d 822, 858] wherein he said: ". . . the line of cases from *Buchanan* through *Shelley* establishes these propositions: (1) When an owner of property is willing to sell and a would-be purchaser is willing to buy, then the Civil Rights Act of 1866, which gives all persons the same right to 'inherit, purchase, lease, sell, hold and convey' property, prohibits a State, whether through its Legislature, executive, or judiciary, from preventing the sale on the grounds of the race or color of one of the parties. *Shelley* v. *Kraemer, supra,* 334 U.S. at 19 [92 L.Ed. at 1183, 3 A.L.R.2d 441]. (2) Once a person has become a property owner, then he acquires all the rights that go with ownership: 'the free use, enjoyment, and disposal of a person's acquisitions without control or diminution save by the law of the land.' (*Buchanan* v. *Warley, supra,* 245 U.S. at 74 [62 L.Ed. at 161, L.R.A.1918C 1201]). *This means that the property owner may, in the absence of a valid statute forbidding it, sell his property to whom he pleases and admit to that property whom he will; so long as both parties are willing parties, then the principles stated in Buchanan and Shelley protect this right. But equally, when one party is unwilling, as when the property owner chooses NOT to sell to a particular person or NOT to admit that person,* as this Court emphasized in *Buchanan,* he is entitled to rely on the guarantee of due process of law, that is 'law of the land,' to protect his free use and enjoyment of property and to know that only by valid legislation, passed pursuant to some constitutional grant of power, can anyone disturb this free use." (Italics added.)

As to the view of the majority that affording a property owner judicial recognition and enforcement of his property rights in the sale or leasing of residential property, on the ground that his motives in selling or leasing were based upon race, color or creed, spells out significant state involvement is

not, I submit, supported by statutory or decisional law. This I say because such denial, *in the absence of a valid regulatory statute,* would deprive such an owner of his property without due process of law because a property owner, as heretofore pointed out, has a constitutionally protected right to use and dispose of his property in whatever manner he wishes, not inconsistent with valid legislation. (*Buchanan* v. *Warley* (1917) 245 U.S. 60 [38 S.Ct. 16, 62 L.Ed. 149]; *Richmond* v. *Deans* (1930) 281 U.S. 704 [50 S.Ct. 407, 74 L.Ed. 1128].)

In other words, since section 26 does not otherwise offend the Fourteenth Amendment, the mere recognition or enforcement by a court of—for instance—the termination of a month-to-month tenancy in accordance with its terms does not render the state responsible for the motives of the landlord.

In the instant case it is clear that section 26 has effectively repealed inconsistent portions of the Unruh and Rumford Acts, *supra.* Plaintiffs are, therefore, in the position of demanding that the courts refuse to recognize or actually prohibit conduct by defendants which is not now proscribed by any legislation.

When the Legislature adopted the Unruh, Hawkins and Rumford Acts, it was making a choice to impose sanctions upon certain owners of certain types of residential property if they refused to sell or lease it upon grounds of race, color, creed or national origin of the prospective purchasers. Certainly it cannot logically be contended that the Legislature would be barred from repealing those portions of the aforesaid statutes directing sanctions at private property owners in dealing with their own property and substitute therefor another program. If the Legislature has such discretion, then under the Constitution of this state, it cannot fairly be said that the people do not.

I am persuaded that none of the types of state involvement which have been held sufficient to invoke the Fourteenth Amendment in the cases relied upon in the majority opinion can be found in the California amendment here under attack. In fact, the very essence of section 26 is to remove the influence of the state from the formulation of private decisions affecting the sale or rental of privately owned residential property.

Plaintiffs seemingly contend and the majority opinion infers that all conduct which the state has the power to prohibit but which it does not prohibit is conduct for which the state is responsible for Fourteenth Amendment purposes. However, the Supreme Court of the United States has consistently and

without exception preserved the fundamental and long recognized principle that the Fourteenth Amendment does not reach private conduct however arbitrary or unenlightened it may be except only where such private conduct involves the performance of a traditional governmental or public function such as the conducting of elections, government of a town, the furnishing of public services under a monopoly granted by government, private zoning through restrictive covenants or operation of municipal parks. There is no suggestion in the cases now before us that the residential property involved is or ever has been owned, operated, financed or maintained by a governmental entity. Here the property is private residential property owned, operated and maintained by the private persons who were defendants in the court below.

Accordingly, the precise holding of the Supreme Court of the United States in the recent case of *Evans* v. *Newton* (1966) 382 U.S. 296 [86 S.Ct. 486, 15 L.Ed.2d 373], based as it was on the continued municipal operation and maintenance of the property devoted to public use as a park, affords no comfort or support whatever to the attack on section 26. Just as the statute in *Burton* v. *Wilmington Parking Authority*, 365 U.S. 715 [81 S.Ct. 856, 6 L.Ed.2d 45], could not provide the basis for a violation of the Fourteenth Amendment, so also section 26 does not provide the basis for a judgment that plaintiffs' constitutional rights have been violated.

Admittedly, since government is not an exact science, one of the important factors deserving consideration concerning existing evils and the remedy therefor is prevailing public opinion. This is especially true when such public opinion has been reached after mature deliberation and is both deep-seated and widespread. By an overwhelming margin of popular votes, the people of California have made the same choice on the issue before us as has been made in 32 of our sister states, and our state still has more extensive regulations against racial discrimination than exist in 41 states of the union.

To analyze in detail the recent U.S. Supreme Court decision in *Evans* v. *Newton, supra,* would unduly prolong this already lengthy dissenting opinion. Suffice it to say that it is the most recent of a long line of United States Supreme Court decisions dating from the *Slaughter-House* cases in 1873 and *Civil Rights* cases in 1883 in which that court has steadfastly limited the sphere of the Fourteenth Amendment to conduct of the state or conduct for which the state can fairly be held responsible. In an unbroken line of decisions that court has

uniformly reiterated the principle that individual invasion of individual rights is beyond the regulatory ambit of the Fourteenth Amendment.

I do not justify discriminatory private conduct nor approve the state's failure to forbid it, but I submit it is not the province of this court by judicial fiat to enact legislation, a function reserved to the People or the Legislature.

As was stated by Mr. Justice Goldberg, joined by the Chief Justice and Mr. Justice Douglas, in *Bell* v. *Maryland, supra* (1964) 378 U.S. 226 at p. 313 [84 S.Ct. 1814, 12 L.Ed.2d 822], arguing for a federal right to equal access to public accommodations which the state may not infringe by judicial action against trespassers: "*Prejudice and bigotry in any form are regrettable, but it is the constitutional right of every person to close his home or club to any person or to choose his social intimates and business partners solely on the basis of personal prejudices including race. These and other rights pertaining to privacy and private association are themselves constitutionally protected liberties.*" (Italics added.)

Discrimination because of race or religion, political beliefs or other irrational grounds influences the conduct of individuals and society in many ways with as many effects. In virtually all but the *artificially framed racial* test case, such discriminations will, if present, be but one of many motivating factors. This, because we must realize that an innate quality of our very nature is that of selectivity. It manifests itself in our human behavior from the time we attain the use of reason practically until we draw our final breath. If, as conceded by plaintiffs in their briefs and at the oral arguments, and recognized in the majority opinion, we may be selective in choosing our associates in clubs, fraternal organizations, social intimates and business partners because of social or religious prejudice, then by what force of logic or justice should the state be permitted to assert its coercive powers to take from the individual property owner the decision as to who shall be admitted to that property as a resident neighbor or to whom the owner thereof may sell it, save by the law of the land? Yet, this is exactly what the state would be doing in denying to a property owner judicial recognition and enforcement of his private contract and property rights upon the ground that his motives in seeking judicial relief are based upon race, color or creed. By reason of the repeal of certain provisions of the Rumford and Unruh Acts by the enactment of section 26, there is no valid existing regulatory statute depriving an owner of residential property of absolute discretion in the sale

or rental thereof. Therefore, since a property owner has a constitutionally protected right to dispose of and use his property in whatever manner he wishes *not inconsistent with valid legislation,* to deny such owner judicial relief would deny to him the equal protection of the laws in violation of the First, Third, Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

The majority opinion relies upon the case of *Shelley* v. *Kraemer*, 334 U.S. 1 [68 S.Ct. 836, 92 L.Ed. 1161, 3 A.L.R.2d 441] as being analogous to the one with which we are here concerned. In *Shelley,* property subject to a racially restrictive covenant had been conveyed by a white owner to a Negro. Owners of a nearby property instituted an action to restrain Shelley, the Negro buyer, from taking possession, and to have title revested in the grantor. This case involved a "willing seller—willing buyer" relationship, and judicial enforcement of the restrictive covenant would have compelled the sellers to discriminate against their wishes. If the *Shelley* case stands for anything, it stands for the philosophy of section 26, by sustaining the freedom of sellers to select whomsoever they choose to buy their property, notwithstanding racial covenants. The key to both *Shelley* and *Barrows* v. *Jackson,* 346 U.S. 249 [73 S.Ct. 1031, 97 L.Ed. 1586] (affirming *Barrows* v. *Jackson,* 112 Cal.App.2d 534 [247 P.2d 99]), where the courts refused to recognize a right to damages in neighboring property owners seeking recovery after breach of a racially restrictive covenant by a willing seller to a minority group buyer, is that, were the courts to give recognition to such a cause of action they would not be acting neutrally but actually would be compelling discrimination by a seller who did not wish to discriminate.

Neither case supports the proposition that a state court would have been under a constitutional mandate to compel an owner to sell to a Negro if he preferred to adhere voluntarily to his restrictive agreement. Indeed, the court in *Shelley* expressly concluded "that the restrictive agreements standing alone cannot be regarded as violative of any rights guaranteed to petitioners by the Fourteenth Amendment." (334 U.S. at p. 13.) Later it noted that *"these are cases in which the States have made available to such individuals the full coercive power of government to deny to petitioners, on the grounds of race or color, the enjoyment of property rights in premises which petitioners are willing and financially able to acquire and which the grantors are willing to sell."* In short, "but for the active intervention of the state courts, . . . petitioners

would have been free to occupy the properties in question without restraint.'' (334 U.S. at p. 19.) (Italics added.)

Plaintiffs' arguments and the majority opinion based on the *Shelley* case simply do not apply to the cases now before this court where an unwilling seller or lessor is involved. As pointed out in *Shelley,* the court there was asked to enforce an agreement which denied to members of one race rights of acquisition, ownership, occupancy and disposition of property rights that were enjoyed as a matter of course by other citizens of a different race or color. Article I, section 26, of the California Constitution, now before us, applies to property owners without regard to race or color and, accordingly, the conduct condemned in the foregoing cases is not present here.

In support of its holding that a discriminatory act, even where the actor is a private citizen motivated by purely personal interests, may fall within the proscription of the equal protection clause if state or local government or the purpose of state or local government is significantly involved, the majority opinion herein cites the case of *Burton* v. *Wilmington Parking Authority* (1961) 365 U.S. 715, 722 [81 S.Ct. 856, 6 L.Ed.2d 45]. This is a leading example of those cases presenting circumstances in which the state has leased state facilities either in whole or in part to a private person or group for carrying on activities or offering services to the public which the government may, but is not obligated to provide.

In *Burton,* the court found significant state involvement in restaurant discrimination because the land and building were publicly owned and had been acquired for ''public use.'' The premises were leased to a private operator but as a part of a publicly owned parking lot where the rental income from the restaurant was necessary for the financial stability of the parking operation.

The *Burton* case and those akin to it simply hold that if a state undertakes to provide or contribute to providing these services, it must obey the strictures of the Fourteenth Amendment, whether the state itself operates the facilities or limits its activities to leasing or financing the facilities operated by private persons but performing the same services.

None of the elements of state involvement present in the *Burton* case—the ''white primary'' cases where the holding was that the state could not escape the provisions of the Fourteenth Amendment by delegating to a private agency functions which were inherently governmental in character; or the so-called ''sit-in'' cases involving either municipal ordinances

requiring racial discrimination, where the court emphasized that it *was not* confronted with a private policy of discrimination or with mere enforcement by a state court of a state criminal trespass statute, but where the state invoked the statute to promote racial discrimination—is possible under the California constitutional provision here under attack. The very essence of section 26 is to avoid state involvement in private decisions in the sale or rental of privately owned residential property.

Plaintiffs rely on the case of *Abstract Investment Co.* v. *Hutchinson,* 204 Cal.App.2d 242 [22 Cal.Rptr. 309], cited in the majority opinion. In this case, the District Court of Appeal reversed a judgment for the plaintiff in an unlawful detainer action on the ground that the trial court had erred in refusing to admit evidence in support of certain affirmative defenses which alleged that plaintiff was terminating the tenancy solely because of the Negro defendant's race. As indicated by excerpts on pages 247 through 251 of the *Abstract* case, the court was holding that under the law *as it then existed* racial discrimination was a ground for a court refusing to entertain or sustain a complaint for unlawful detainer because racial discrimination was contrary to the public policy declared inter alia in our state Constitution and in the Unruh and Hawkins Acts adopted by our state Legislature.

The extent of the significance attached by the District Court of Appeal to these state laws is reflected in its extensive discussion at pages 251 through 255 of the opinion concerning the constitutionality and applicability of these statutes.

To the extent that the court in *Abstract* relied upon state antidiscrimination legislation it should not be applied to cases such as the instant one involving as it does the leasing of residential property because of non-regulation by the state embodied in section 26. Likewise, to the extent *Abstract* was based upon the public policy provisions of the state Constitution, the holding was overruled by the adoption of section 26, here under attack insofar as the sale or leasing of residential property is concerned.

As I view it, another important issue presented to us is whether in the several states a person has a right of action under the Fourteenth Amendment to obtain judicial relief against another person who refuses on grounds of race to deal with him in the sale or leasing of private residential property. If he has such a right of action, then I agree that neither section 26, nor any statute, decision of any court, nor any vote of the electorate can properly deny it.

Also, I certainly agree that conduct based on racial prejudice is injurious, that it is irrational, uncharitable, unenlightened and arbitrary. What I disagree with is the essential foundation of plaintiffs' claim that racial discrimination practiced by private owners of private residential housing is directly forbidden by the Fourteenth Amendment. However delicately or artfully plaintiffs phrase the problem, whether in terms of "state responsibility" for not prohibiting what it has the power to prohibit, or of "abdication of state responsibility" or of "purposefully permitting," "authorizing" or "encouraging" discriminatory conduct, none of these words is so magic as to obscure the plain fact that the only conduct which has injured these plaintiffs is the conduct of private citizens with respect to their own private residential property. I submit the state cannot fairly be held responsible for that conduct unless it has a duty under the Fourteenth Amendment to prohibit such conduct, and that a state has that duty only if the Fourteenth Amendment contains a self-executing cause of action for racial discrimination in private housing.

No single case relied upon by plaintiffs or cited in the majority opinion holds or even suggests that there is such a cause of action under the Fourteenth Amendment. On the contrary, the authorities are unanimous in holding that no such federal constitutional cause of action now exists, that the Fourteenth Amendment does not extend and that sound reasons forbid its extension to the private conduct here involved.

Furthermore, recourse to the legislative history and debates in the Congress at the time the Fourteenth Amendment was under consideration clearly establishes that the amendment was designed to correct the unjust legislation of some of the states to the end that the law which operates upon one man shall operate equally upon all. This legislative history indicates that the purpose of the amendment was to prohibit *state* legislation such as was adopted in some of the states following the Civil War preventing Negroes from purchasing or leasing land, buying or selling other property or even making contracts precisely as by the federal Constitution, a state is forbidden to pass an "ex post facto law."

The Thirteenth Amendment had just been adopted inhibiting slavery but leaving the freedom of the emancipated people in the power of the states. Hence the necessity of the prohibition to the states. By the very language of the amendment it is manifest that its entire structure rests on the discrimination made by laws of the various states.

In an area concerned solely with the rights and obligations of citizens toward each other, the people have a right either directly or through their elected representatives to regulate that kind of conduct or not to regulate it. The adoption of section 26 of the Constitution of California evidences the decision of the people not to regulate such conduct in the sale or leasing of private residential property and extends such freedom of action to all persons, unrestricted by racial or religious barriers.

I would affirm the judgment.

McCOMB, J.—I concur with the views expressed by Mr. Justice White in his dissenting opinion.

The people of California, under the legislative power reserved to them (Cal. Const., art. IV, § 1)[1] have, by enacting section 26 of article I, guaranteed to all persons, regardless of race, color or religion, equal rights in their property.

Every person, regardless of his race, color or religion, as an incident of the right to own, possess and enjoy real property, has the right to sell or lease, or to decline to sell or lease, his property to anyone regardless of the race, color or religion of the person with whom he is dealing.

Unless we are to become a socialistic state in which the people have only limited, if any, rights to privately own, possess, enjoy and/or dispose of property, real or personal, the proposed decision is obnoxious to our basic form of government.

The people of California, by enacting section 26, article I, of the Constitution, have made it altogether clear that they wish to retain the right to own, possess and enjoy private ownership of property.

By its decision, our court has effectively nullified the will of the people, from whom it derives its power.

I completely disagree with the majority that the subject enactment encourages discriminatory conduct. To me, section 26 is a restatement of a fundamental principle that all property owners have a right to enjoy or to dispose of their

---

[1]Article IV, section 1, reads: ''The legislative power of this State shall be vested in a Senate and Assembly which shall be designated 'The Legislature of the State of California,' but the people reserve to themselves the power to propose laws and amendments to the Constitution, and to adopt or reject the same, at the polls independent of the Legislature, and also reserve the power, at their own option, to so adopt or reject any act, or section or part of any act, passed by the Legislature.''

property in any lawful manner, in their absolute discretion.

Respondents' petition for a rehearing was denied June 8, 1966, and the opinion was modified to read as printed above. White, J.,* sat in place of Mosk, J. McComb, J., and White, J.,* were of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.